**Lawrence Reginald MILLER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 22443.**

United States Court of Appeals
Fifth Circuit.

Feb. 1, 1966.

Certiorari Denied April 18, 1966.

See 86 S.Ct. 1357.

Wm. R. VanDercreek, Dallas, Tex., for appellant.

B. H. Timmins, Jr., Bailey F. Rankin, Asst. U. S. Attys., Dallas, Tex., Melvin M. Diggs, U. S. Atty., for appellee.

Before JONES, Senior Judge,* and GEWIN and BELL, Circuit Judges.

GEWIN, Circuit Judge.

Appellant Miller was tried and convicted by a jury in the United States District Court for the Northern District of Texas. The indictment contained five counts; Count 3 was dismissed on motion of the Government. Count 1 charged that Miller unlawfully received, concealed and retained, with intent to convert to his own use and gain, two .30 caliber Browning machine guns, two .30 caliber Browning automatic rifles, and one .45 caliber sub-machine gun, all being the property of the United States, in violation of Title 18 U.S.C.A. § 641. The other three counts charged that he knowingly and unlawfully possessed certain of said firearms in violation of Title 26 U.S.C.A. §§ 5851 and 5861. He was sentenced to serve a term of four years on all counts generally. The appellant specifies two errors: (1) his arrest was made without *probable cause,* because the Dallas city police utilized a traffic violation as a "ruse" for such arrest; and (2) the *search* of the automobile in which he was riding as a passenger and the contemporaneous *seizure* of the weapons found therein were made in violation of the Fourth Amendment to the United States Constitution.

A preliminary question is presented by the motion of the Government

* Of the Court of Claims, sitting by designation.

to dismiss the appeal because notice of appeal was not timely filed. After a hearing on this question pursuant to a § 2255 motion, the trial court concluded as follows:

"Although said defendant was advised of the right to appeal, he was not advised that such appeal must be perfected within ten days after judgment of conviction, in accordance with F.R.Cr.P. 37(a) (2); therefore, under the rule of this Circuit as stated in Boruff v. United States (5 Cir. 1962), 310 F.2d 918, the ten-day period within which he was required to file his notice of appeal did not commence to run until the date of entry of this order, when he was actually notified of his right to appeal and of his right to have counsel to assist him."

In view of the conclusion reached by the trial court, the motion to dismiss the appeal is DENIED. We proceed to consider the case on the merits.

On the evening of November 13, or in the early morning hours of November 14, 1963, ten military weapons, title to which was vested in the United States, were stolen from the Terrell National Guard Armory, Terrell, Texas. Some four to five days later, on the evening of November 18, 1963, around dusk, Miller was observed by four Dallas police detectives and an F.B.I. agent who had been assigned to the case, riding as a passenger in a light blue 1962 Ford Thunderbird as it came alongside a late model Dodge sedan near the intersection of Main and Trunk Streets in the city of Dallas. After the Thunderbird stopped near the Dodge, the F.B.I. agent and the city detectives witnessed a transfer of some "large weapons" from the Dodge to the Thunderbird, such transfer being made jointly by Miller and his companion. Shortly thereafter, the Thunderbird, with both Miller and his companion riding therein, pulled away from the Dodge. The Thunderbird was then followed by the F.B.I. agent and two of the city detectives in a city automobile, as well as by a Dallas police patrol car

which had been instructed via radio to arrest the occupants of the Thunderbird. The vehicle in which the F.B.I. agent and city detectives were riding remained some distance behind the Thunderbird, but the police patrol car moved close behind the suspect's car at the intersection of Hall and Elm Streets. After stopping momentarily for a red light, the Thunderbird proceeded into the intersection against the red signal before it had changed to green in its traffic lane. The officers in the city patrol car, which was some ten to fifteen feet behind the Thunderbird flashed their red lights and blew their horn for the suspect's car to pull over to the curb. Instead of obeying these signals, the Thunderbird pulled away from the police patrol car and took flight, reaching a speed of about 60 miles per hour. A chase ensued through the city streets for several blocks. The police patrol car followed the Thunderbird with its siren on and red lights flashing. Two city detectives and the F.B.I. agent who observed a transfer of the weapons followed a further distance behind. Shortly thereafter, as the Thunderbird attempted to make a left turn, the driver evidently lost control and the vehicle collided with a telephone pole. The city police patrolmen immediately drove up to the scene of the accident and, after the occupants had emerged from their vehicle, arrested and searched them. The police patrolmen and the F.B.I. agent noticed several military weapons lying on the floor of the Thunderbird between the front and the rear seats. Although the weapons were partially covered by a "Dearborn stove," the muzzles of the firearms were in plain view from outside the automobile. Subsequently, the weapons were removed from the Thunderbird by the police patrolmen and turned over to the property custodian of the Dallas Police Department. They were later carefully identified and introduced in evidence at Miller's trial.

During the course of the trial these same weapons were on a table in open court in plain view of the court, counsel

for both parties and the jury. After two of the witnesses for the Government had testified and positively identified the weapons, they were offered in evidence. During cross-examination of one Government witness, police officer J. B. Allen, counsel for Miller inquired extensively concerning the identity of the weapons, the presence of the officer's initials on them and the date when his initials were affixed. All of this occurred within the presence and hearing of the jury. Thereupon, counsel for Miller made a motion to suppress this evidence, claiming that Miller was unlawfully arrested and that the weapons were obtained by and through an unlawful search and seizure. No such motion was made prior to trial. The motion was overruled by the trial court.

The threshold question in this case is whether under these particular facts, Miller's arrest was made with or without probable cause. Secondly, it must be determined whether the search and seizure was reasonable. If the arrest was legal and the weapons obtained by a "reasonable" search and seizure, they are competent evidence; otherwise, not.

■ When an arrest is made without a warrant, as in the case at bar, there must be probable cause for making it. The arresting officers must possess knowledge of facts and circumstances gained from reasonably trustworthy sources of information sufficient to justify a man of reasonable caution and prudence in believing that the arrested person has committed or is committing an offense. Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142. See also Piland v. State, 162 Tex.Cr.R. 362, 285 S.W.2d 230; Hatfield v. State, 161 Tex.Cr.R. 362, 276 S.W.2d 829; Soileau v. State, 156 Tex.Cr.R. 544, 244 S.W.2d 224; 6 Tex.Jur.2d Arrest, § 18;

Wharton's Criminal Law and Procedure (Anderson 1957), Vol. IV, § 1612, p. 274. As stated by the Court in Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879, 1890, and approved in the Beck decision:

"The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

Miller forcefully contends that the Dallas police officers in question had no "probable cause" to effect his arrest in the first instance, but that even supposing they did, the arrest was nevertheless based on a "ruse," namely a "trumped-up" traffic charge which violated vital constitutional safeguards. Therefore, argues Miller, since the arrest was illegal *ab initio*, the weapons seen and subsequently taken into custody from the floorboard of the Thunderbird in which he was a passenger may not be received in evidence because they were not secured incident to a lawful arrest.

■ As to the asserted absence of "probable cause," we turn to the record to inquire into the validity of such a contention. So far as the record shows, the Dallas police patrolmen were cruising in the general vicinity where the suspect's car was located when they received information "over the air" to follow the suspect's automobile and to "arrest them." [1] This testimony leads to the indelible conclusion that the officers who made the arrest were in possession of information from a trustworthy source sufficient to constitute "probable cause."

---

1. The following was elicited on cross-examination by one of the Dallas patrolmen, J. B. Allen by defense counsel:
 "Q. As I understand, you were following this Thunderbird automobile?
 A. Yes, sir.
 Q. And had you been following them approximately a block, is that correct?
 A. Yes, sir.

Q. Had you been instructed by someone to follow them?
A. Yes, sir.
Q. Over the air?
A. Yes, sir.
Q. Now then, were you told to arrest them or just to follow them?
A. To arrest them."

True enough, the record is silent as to just what these policemen heard "over the air" other than the instruction to arrest the occupants of the Thunderbird. However, it is inconceivable to suppose that the information thus gained would not warrant a belief on the part of these officers, as reasonably prudent traffic patrolmen, that an arrest was justified. In fact, just the reverse is true. The police department of a large metropolis does not and can not operate on a segmented basis with each officer acting separately and independently of each other and detached from the central headquarters. There must be cooperation, co-ordination and direction, with some central control and exchange of information. See Wyndham v. United States, 197 F.Supp. 856, 859 (D.C.1961); Burke v. State, 76 Ga.App. 612, 47 S.E.2d 116, 126; Green v. City of Bennettsville, 197 S.C. 313, 15 S.E.2d 334, 337. It is difficult to believe that two city patrolmen, two city detectives and an F.B.I. agent were present in police vehicles following the defendant entirely by accident or mere coincidence. This is especially true in view of the facts that (a) four city detectives and the F.B.I. agent observed the transfer of the weapons by Miller and his companion from the Dodge to the Thunderbird only a few minutes before, (b) the patrolmen were thereupon notified to make the arrest by radio, (c) the five officers followed the suspected car in its flight, and (d) all stopped at the scene of the collision with the utility pole.

Miller relies quite heavily upon the decision in Taglavore v. United States (9 Cir. 1961) 291 F.2d 262, and contends that it sustains his position. We disagree. In Taglavore the police engaged in a deliberate scheme to evade the requirements of the Fourth Amendment by using a traffic arrest to search for narcotics which they suspected the defendant had *on his person*. The record in that case fails to disclose any information from any source to support the officers' suspicion that the defendant had committed or was committing a crime. In fact the record did not disclose any reasons whatever to show why the officers suspected Taglavore. The alleged minor traffic violation had occurred the night before his arrest, but the warrants for his arrest were not issued until the following afternoon. The warrants had no connection with the narcotics violation with which the defendant was ultimately charged.[2] Actual physical force of an overpowering nature was evident in *Taglavore*, whereas in the instant case no physical force outside that normally used to handcuff Miller was revealed by the testimony.

A case more in point and having many important factual similarities to the one at bar is our recent decision in Jackson v. United States (5 Cir. 1963) 319 F.2d 782. In Jackson the arresting officer gained his information by radio with only a general description of the vehicle involved. He stopped the defendant's vehicle, flashed his light in the car and saw the weapon which resulted in the arrest. Relying on the authority of Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, we held there was probable cause for the arrest. Also remarkably similar to the case at bar is the recent decision in the Ninth Circuit, Lipton v. United States (1965) 348 F.2d 591. The defendant, Lipton, was indicted, tried, and convicted under the Dyer Act for the unlawful transportation in interstate commerce of a stolen motor vehicle. There was a motion to suppress the evidence discovered by a city motorcycle patrolman when the defendant allegedly violated a traffic law which led to the first arrest, for driving without a driver's license, and then to a second arrest for possession of a stolen motor vehicle. The motion to suppress was denied and on appeal the defendant contended (1) that there was no legal right, justification, or probable cause for the of-

---

2. The following is from the opinion:
 "It appears that Inspector Calhoon, for reasons not appearing in the record, suspected that appellant was connected in some way with these narcotics violations."

ficer's stopping the automobile driven by him; and (2) that his arrest was without probable cause and therefore unlawful. On the issue of probable cause, the Court stated:

> "When appellant was unable to produce the driver's license in response to officer Snow's demand, then the officer had probable cause to arrest the appellant, as he did, for violation of § 12951 of the California Vehicle Code. *Upon learning via radio from his headquarters that the car was a stolen car in the possession of appellant, the officer then had probable cause* for arresting appellant, as was done, on the further charge of driving a stolen vehicle." (Emphasis added)

The facts established in *Jackson* and *Lipton* as to the method of receiving information and the source of it, and those in the instant case which led the Dallas police to apprehend Miller are clearly analogous.

We are not unmindful of the fact that the violation of a constitutional right by subterfuge cannot be condoned, but the circumstances in the case before us point clearly to the opposite conclusion on the issue of constitutional wrongdoing. It is of continuing importance to take note of the fact that differences of kind

and degree are crucial when constitutional principles are at stake. However, to hold as Miller suggests, that the Dallas police patrolmen had no legally justifiable right to arrest for a traffic violation which was actually committed in their presence because it was a "subterfuge" for a more sophisticated apprehension is, in itself, an argument infected with deception. Although Officer Allen testified that he was waiting for a traffic violation to be committed before arresting Miller, the facts clearly show that "probable cause" for the arrest had arisen *prior* to the officer's conclusion to await the commission of a traffic violation before apprehension. We hold that there was probable cause for the arrest, and that it was legal.

 We now turn our attention briefly to Miller's contention that there was an unlawful search and seizure of the weapons here involved. Having concluded that the arrest was legally justified, we deal only with the manner and scope of the search and seizure in the circumstances of this case. Both the Fourth Amendment to the United States Constitution and the Constitution and Statutes of Texas prohibit *unreasonable* searches and seizures. We are not dealing with a factual situation primarily involving a search.[3] To observe that

---

3. On direct examination, Officer J. B. Allen testified:

"Q. And then, when defendant got out of the car, what did you do, Mr. Allen?

A. Well, we—I shook him down, put handcuffs on him.

Q. When you say 'shook him down,' do you mean searched him?

A. Yes.

Q. You put handcuffs on him?

A. Yes sir.

Q. Did you then put him in the patrol car?

A. No, sir. We saw this evidence here in the back.

Q. Did you look inside the automobile, inside the Thunderbird?

A. Yes.

Q. And when you looked inside of it, what did you see?

A. Saw these weapons laying in the floor, between the front and the back seat."

F.B.I. Agent Abernathy testified as follows:

"Q. Did you follow the two cars—

A. Yes, sir.

Q. —or what did you do, Mr. Abernathy?

A. Yes, sir.

Q. And did you stay within view of the Thunderbird or not?

A. Yes, sir.

Q. All right, sir. When did you—when did you next see the defendant?

A. I next saw the defendant at the corner of Gaston and Hall, after they had—the car had been involved in a collision there, where it ran into a telephone post while trying to make a left turn, and the defendant was standing outside of the Thunderbird on the pas-

which is open to view is not generally considered a "search." This record unquestionably supports the Government's contention that these weapons were in clear view of the policemen standing outside the Thunderbird. No "search" was necessary to uncover the evidence. Such being the case, we find no merit in the argument that an unreasonable "search" was consummated by the Dallas patrolmen. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; United States v. Williams (6 Cir. 1963) 314 F.2d 795; Bates v. United States (9 Cir. 1965) 352 F.2d 399. The law of Texas is in accord with this proposition. Crowell v. State (1944) 147 Tex.Cr.R. 299, 180 S.W.2d 343; Giacona v. State (Tex.Cr.App. 1962) 372 S.W.2d 328. Moreover, even if there was a "search" in a technical sense, the officers were justified in looking into the Thunderbird and taking possession of the weapons lying on the floor since at least a portion of them was clearly visible. Agnello v. United States (1925) 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145; Martin v. United States (5 Cir. 1962) 301 F.2d 81; Slade v. United States (5 Cir. 1964) 331 F.2d 596. The seizure of the contraband in the instant case was effected essentially contemporaneously with the arrest and took place within the immediate surroundings of the arrest. No force was evident which could be denominated "unreasonable" in an attempt to secure these weapons from the Thunderbird. The record evidence convinces us the seizure of the weapons was conducted in a reasonable manner.

It is our conclusion that the record fully supports a finding of a lawful arrest and a reasonable search and seizure incident thereto; and the motion to suppress was properly denied.

The judgment is affirmed.

senger side, and the officer had just put the handcuffs on him.
Q. All right, sir. Did you have occasion to look in the car?

A. I did, sir.
Q. What did you see inside of it?
A. I saw these weapons right here."