Clifford H. DAVIS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 26202.

United States Court of Appeals Fifth Circuit.

April 14, 1969.

Paul M. Moore, Calhoun City, Miss. (court-appointed), for appellant.

H. M. Ray, U. S. Atty., Roger M. Flynt, Jr., Asst. U. S. Atty., Oxford, Miss., for appellee.

Before COLEMAN and GODBOLD, Circuit Judges, and SCOTT, District Judge.

COLEMAN, Circuit Judge:

The indictment charged that on November 7, 1967, this appellant and two others [who were not tried with him], aided and abetted by each other, did enter a bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, with intent to commit the larceny of said funds, in violation of §§ 2 and 2113(a), Title 18, United States Code. He was found guilty by a jury and sentenced to a term of fourteen years. He appeals and we affirm.

The bank was situated in the village of Hickory Flat, Mississippi, population 500, located on U. S. Highway 78, fifty-six miles southeast of Memphis. A listening device had been installed in the bank to aid in the apprehension of burglars. A transmitter was attached to a telephone and connected by wire to a loudspeaker in the bedroom of a deputy sheriff, who lived about five hundred feet away. The device was turned on when the bank was closed for the day and turned off when open for business.

About four o'clock of a cold, frosty morning, and for the first time since the system had been installed, noises from the loudspeaker awoke the deputy's wife, who then awakened her husband. In a hearing out of the presence of the jury, the deputy testified that he heard voices and noises coming over the loudspeaker. He heard hammering and hissing such as ordinarily emanates from acetylene torches. There were at least two human voices. One said, "Cut the torch off". Another said, "Be easy with the door". There were sounds of objects being dragged across the floor.

In this state of affairs, at that time of night, in that locality, the deputy did not have to consult a manual or seek the advice of the United States Attorney to believe, with all reason, that a felony was in commission—that undoubtedly a bank burglary was in progress.

He raised the hue and cry—electronically—by telephoning the nearest police department, in Holly Springs, telling the night operator what he had heard and requesting that the resident investigator of the state highway patrol be notified. Upon receiving this message the investigator telephoned J. M. Ash, the Sheriff of Marshall County, passing on the information thus received. The burglary was taking place in Benton County, at a point about seven miles from the Marshall County line, but on his way to the locus criminis the investigator picked up Sheriff Ash. While thus enroute these officers overheard other information being broadcast over the highway patrol radio.[1]

In the meantime, the deputy approached the bank. He saw a van truck parked nearby and overheard footsteps in the gravel, going to and fro between bank and truck.

Shortly afterward, a police car from New Albany drove up, turned around, and left. It was thought that this would flush the burglars so the patrol investigator drove up to the bank, siren blowing, and shouted by means of a loudspeaker for the occupants to come out and surrender.

The circumstances of the Davis arrest may best be stated in the words of Sheriff Ash:

"I got out almost in front of Farr Motor Company,[2] it was at the north-west corner of Farr Motor Company on 78 Highway, I went up the edge of 78 Highway towards the north-east corner of Farr Motor Company, and I saw two people between Farr Motor Company and a truck and trailer that was parked there. At the time I saw them Inspector Warren turned the siren on the car that I'd got out of, and these two people had something in their hands and they dropped it between the truck and Farr Motor Company and started running north across 78 Highway. Mr. Pegram [co-indictee] went to my left, Mr. Davis started to my right. I hollered at both of them to stop. Pegram continued to go on across the highway and I ran up towards the front of Farr Motor Company in front of Davis and got him stopped and put him under arrest.

"He was dressed in blue denim pants, a brown plaid shirt, a blue denim jacket and a kind of a pulled-down cap and black gloves, and they were all wet [on a cold, frosty morning].

"Q. What was the condition of the bank at the time you went in it?

"A. It was real smoky, water all over the floor. There was a hose that had been, I suppose, pushed in from the outside, and the door of the vault had a big hole cut in the lower part of it. Inside the vault the locked boxes, a number of them, had been opened

---

1. [Testimony of J. M. Ash, Transcript, 165]
   "Q. Calling your attention to the morning of November 7, 1967, did you have an occasion to be in Hickory Flat, Mississippi?
   "A. Yes, sir.
   "Q. For what reason were you there?
   "A. I was called by the Holly Springs police department—
   "Q. After receiving the call did you go there?
   "A. Yes, sir, I went to Hickory Flat with Inspector Jimmy Warren.
   "Q. How did you go?
   "A. In a car with Inspector Jimmy Warren.
   "Q. Approximately what time did you arrive in Hickory Flat?

   "A. It was about 4:20 or thereabouts."
   [J. M. Ash on Cross-Examination, Transcript, 180]
   "I had been informed that there was a bank burglary there. I heard over the two-way radio just before we got to the Hickory Flat Bank that we had better hurry up and get there, that they were fixing to leave, and when I hollered at them to stop and these two men started running, yes, sir, I had pretty good evidence that he [Davis] was involved in the bank burglary".

2. The proof showed that "it is just a few feet between Farr Motor Company and the bank", Transcript, 172.

and the balance of them either shaved or scrubbed off real clean. There was an acetylene or oxygen tank and cutting tools on the inside of the bank." [Transcript 168, 169]

On cross-examination, Transcript 180, 181.

"Q. Tell us, Mr. Ash, please exactly what you told Mr. Davis when you put him under arrest.

"A. I hollered at the two of them and told them that they was under arrest. I told Mr. Davis several times that he was under arrest, to stop. He made several attempts to get away. One particular time was between Farr Motor Company and a little building of some type that was sitting there. A number of times I told him that he was under arrest.

"Q. Did that constitute the entire language that's what I told him, that he was under arrest?

"A. I don't recall just the exact words but that's what I told him, that he was under arrest.

"Q. Did you inform him for what crime or what purpose you were arresting him?

"A. For bank burglary, yes, sir.

"Q. You told him that on that date?

"A. Yes, sir.

"Q. At that time that you arrested him and caused him to lie down there on the ground had you any information, knowledge to yourself, that he was a participant?

"A. Yes, sir, I saw Mr. Davis and Mr. Pegram by the side of the truck, they both dropped something there by the side of the truck and they started running, I had been informed by two or three different ways that there was a bank burglary going on there—."

"Q. Did you have an occasion to examine the tractor-trailer-truck?

"A. Yes, sir.

"Q. Would you tell us of that?

"A. Yes sir, the tractor-trailer was parked by the side of Farr Motor Company and the back of the trailer was towards the bank. The door on the east side of the trailer was partly open and you could see into the trailer and there was money, silver, that was scattered all in the door of the trailer and there was silver on the ground leading from towards the bank to the trailer door. I was standing on the outside of the trailer when some officers went through the things that were in the trailer. There was an automatic shotgun—

"(Continuing) Standing on the outside looking in as they went through the things that were in the trailer, an automatic shotgun loaded with buckshot, there was a pistol that was loaded, there were some dynamite, dynamite caps, and some oxygen or acetylene tanks in the truck in the tractor part of it." [Transcript 172, 173].

Following Davis' arrest, he was taken to the front of the bank where his clothing was removed by the F.B.I. for purposes of examination. At trial, a government expert witness testified that particles on Davis' clothing matched debris on the floor of the bank at the point where the bank had been entered and the vault opened.

Obviously, appellant was caught in the act of burglarizing the bank. Astute defense counsel, court appointed, who has vigorously represented the appellant both at trial and on appeal, introduced no proof in the court below. He did a splendid job of probing for and attacking any possible weakness in the government's case. He raises three contentions in this appeal: (1) Davis' arrest, which was not based on probable cause, was illegal; therefore the clothing which was taken from him at the bank was improperly admitted into evidence; (2) the Court erred in admitting evidence regarding Davis' associates [co-indictees] and with reference to the tractor-trailer truck and automobile in which one of them was arrested; and (3) the Court erred in limiting the jury argument of defense counsel.

1. Validity of the Arrest and Subsequent Seizure of Davis' Clothing.

Under the standard established by the Supreme Court, an arrest without a warrant is valid if

" * * * at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. State of Ohio, 379 U.S. 89 at 91, 85 S.Ct. 223 at 225, 13 L.Ed.2d 142.

▆▆ Since the arrest was made by a state officer, although beyond his territorial jurisdiction, we apply the state test to the validity of this arrest, Henderson v. United States, 5 Cir. 1968, 405 F. 2d 874. As Sheriff Ash was beyond the limits of his county we shall treat the arrest as made by a private person.

Mississippi has a statute on the subject, Mississippi Code (1942) § 2470. It is interesting to note that this statute appeared in identically the same verbiage in the Codes of 1871, 1892, 1906, 1917, and 1930. It reads as follows:

"An officer or private person may arrest any person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; * * *; or when a felony has been committed, and he has reasonable ground to suspect and believe the person proposed to be arrested to have committed it; * * *".

We might dispose of the matter on the simple premise that when Davis was arrested he was in the act of committing a felony in Ash's presence.

▆ The decision, however, need not turn on that ground. In our view, from the circumstances recited, Ash had, in the words of the statute, "reasonable ground to suspect and believe the person proposed to be arrested to have committed" a felony. To use the generally accepted federal term, there was probable cause for the arrest.

A classic case on probable cause under Mississippi law is Craft v. State, 202 Miss. 43, 30 So.2d 414 (1947). The opinion of the Court was delivered by that eminent judge, Presiding Justice Virgil A. Griffith, an unexcelled analyst whose habit was to write with all the clarity of a Holmes or a Lincoln. In the *Craft* case the Sheriff had reliable information that on a Sunday night a felony had been committed at or near the home of a Negro family in Smith County, but he had no information as to the identity of the felon. About eight o'clock the next morning, he went to investigate, accompanied by a deputized posse. When the officers were seen to approach several of the occupants fled the house. While being thus pursued, one of the Negroes fired upon the Sheriff but missed. For this he was convicted and sentenced to the penitentiary. The Supreme Court reversed the conviction and ordered the defendant discharged for the reason that the attempted arrest was unlawful and the defendant was justified in firing on his assailants after they first had fired upon members of the fleeing party. In the course of the opinion it was stated:

"Under our statute, Section 2470, Code 1942, an arrest may be made without warrant and for an offense not committed in the presence of the person making the arrest when a felony has been committed and the person making the arrest 'has reasonable ground to suspect and believe the person proposed to be arrested to have committed it.' The statute is declaratory of the common law and under it there must be probable cause to believe that (1) a felony has been committed, and (2) that the person to be arrested is the guilty party. Howell v. Veiner, 179 Miss. 872, 880, 176 So. 731. It is not enough that there is good ground to believe that a felony has been committed, but the ground for the belief must include also as an element essential to the right to arrest that the party to be arrested is the person guilty of the felony. Without the second element the first had as well not existed.

"And it is not enough that there was good ground to believe that the person proposed to be arrested was present at the time the felony was committed. This was in effect so held in Cochran v. State, 191 Miss. 273, 276, 2 So.2d 822, 823, a case where an arrest was made on direct information that the person arrested was present, and wherein nevertheless the arrest was held to have been unlawful, for the reason that 'some degree of participation in the criminal act must be shown in order to establish any criminal liability. Proof that one (was present or) has stood by at the commission of a crime without taking any steps to prevent it does not alone indicate such participation or combination in the wrong done as to show criminal liability, although he approves of the act'."

Two years earlier, in Leflore v. State, 197 Miss. 337, 22 So.2d 368 (1945) [which the present writer prosecuted in his halcyon days, as District Attorney] the Mississippi Supreme Court read the other side of the coin. There a dead body, obviously dispatched by violent means, was found by the roadside. The sheriff was notified. He followed a trail of blood, broken twigs, and disturbed grass up to where it stopped at the home of the defendant. He there discovered that the yard had recently been thoroughly swept; there was blood near the front steps covered with ashes; there was a smouldering fire wherein clothing had been burned; and there were blood stained blocks concealed in a hollow tree. The Supreme Court held that probable cause existed for the arrest of the defendant without a warrant.

In the case now before us it is not to be doubted that Mr. Ash and the other officers had credible information that the bank was being burglarized. Moreover, from what he observed with his own senses Mr. Ash had good reason to believe that Davis was one of those engaged in the felony. The arrest without a warrant was perfectly lawful.

This being true, the officers acted within their lawful authority in removing the clothing of the defendant and subjecting it to laboratory analysis. The results were admissible in evidence, Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

2. Admissibility of Evidence Showing Thogmartin's and Pegram's connection with the Burglary.

The indictment under which Davis was brought to trial charged Davis, Thogmartin and Pegram with aiding and abetting each other in burglarizing the bank. Davis now says that there was no evidence to prove a common plan or association of himself with the others, and therefore it was error to permit the government to introduce evidence concerning Thogmartin's and Pegram's connection with the burglary. Specifically, appellant objects to the admission of Pegram's clothing, articles found in the tractor-trailer truck parked near the bank, and evidence concerning the automobile which Thogmartin was driving when arrested soon afterward.

The evidence was more than sufficient to establish that Davis aided and abetted the others in the commission of the bank burglary. It has long been settled that the *acts* of all participants in the commission of a crime are admissible *against* the others even though no conspiracy is charged. United States v. Messina, 2 Cir. 1968, 388 F.2d 393, 394; United States v. Sears, 7 Cir. 1964, 332 F.2d 199, 201 (photograph of automobiles and other objects used in the commission of a robbery and a sack dropped by one of the robbers).

As to the evidence found in the trailer, it was established at the trial that when Sheriff Ash and Investigator Warren arrived at the bank and approached the trailer, the side door was open and they could see burglary tools, torch equipment and sacks of money. We reject appellant's position that this was an unreasonable search. Actually, this was not a "search" within the meaning of the Fourth Amendment, since the evidence

was open to the view of the officers. Miller v. United States, 5 Cir. 1966, 356 F.2d 63, 69. And, even if we assume there was in fact a "search", it was valid as incidental to a lawful arrest. Agnello v. United States, 269 U.S. 20, 30, 46 S. Ct. 4, 70 L.Ed. 145 (1925).

### 3. Limitation of Argument for the Defense.

 In his brief and in oral argument before this Court counsel for the appellant strongly complains that his closing argument to the jury was unduly circumscribed by the trial judge. The argument was being made that the highway patrol investigator had made inconsistent statements in a state court hearing. Thereupon, defense counsel announced that he would forthwith read that statement. The United States Attorney objected. The Court promptly overruled the objection, but said, "However, make your comment to the jury on that brief. It has been read already in your cross examination". Thereafter, defense counsel completed his argument without objection from the government or interruption from any other source.

We cannot see that this amounted to reversible error, if error at all.

The objection no doubt interrupted counsel's argument but if that hurt anybody it must have been the prosecution for the jury saw the objection promptly overruled. It is true that the court asked counsel to be brief in his discussion of the point but in the same breath pointed out that the statement in question had already been read to the jury. It is now urged that when the trial judge asked for brevity he inferentially disparaged the point. We do not think so, because the judge proceeded immediately to say that the jury had already heard the statement read in full, thus indicating that the jurors could be expected to remember what it contained. He did not tell counsel that he could not read the statement. He had just overruled an objection to the reading of it. The transcript reveals that counsel did not quit speaking until he was ready; he was neither interrupted again nor stopped by the court.

At the trial below and in this Court, appellant has been represented by Paul Moore, Esq., of Calhoun City, Mississippi. We have rarely witnessed a more thorough or more unstinted expenditure of effort by able counsel on behalf of a client. The thanks of the Court are tendered to Mr. Moore for his outstanding services, and the judgment of the District Court is

Affirmed.