**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Flavio Humberto TRABUCCO, Defendant-Appellant.**

**No. 27476.**

United States Court of Appeals, Fifth Circuit.

April 15, 1970.

Rehearing Denied May 13, 1970.
Certiorari Denied June 26, 1970.
See 90 S.Ct. 2224.

**1312**

Lucius M. Dyal, Jr. (court appointed), Tampa, Fla., for defendant-appellant.

Edward F. Boardman, U. S. Atty., Robert H. MacKenzie, Special Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge.

This direct criminal appeal raises questions of probable cause for a warrantless arrest, admissibility of a confession, proof of the corpus delicti, and correctness of jury instructions. The question of probable cause is close; the confession question unusual because of the defendant's language barrier and cultural background; and the issue of jury instructions complicated by a recent Supreme Court ruling. But after close consideration we affirm the conviction.

## I.

Customs agents and other law enforcement officers [1] took Flavio Humberto Trabucco, a Chilean seaman, into custody from his ship, the "Chilean Nitrate", about 9:00 p. m. the evening of August 29, 1968, in the port of Tampa. The Chilean Nitrate was due to leave port that evening. During the trip into town, one of the officers who spoke Spanish chatted generally with Trabucco, asking whether he had been into town and enjoyed his visit to Tampa. Trabucco replied that he had been to different bars and had done some shopping. Upon arrival at the sheriff's office, officers escorted Trabucco to the polygraph room. There two officers asked him whether he knew a man named Roberto Bravo and whether he had ever been to the Sheraton-Tampa Hotel. Trabucco answered "No" to both questions. Meanwhile, Miss Sesylia Pardo, an employee of the Sheraton-Tampa, positively identified Trabucco (observing him through a see-through glass) as the man who had asked for Roberto Bravo's room number a couple of days earlier and whom she had observed sitting with Roberto Bravo [2] in the hotel lobby. An officer informed Trabucco that he had been identified as having talked with Roberto Bravo in the Sheraton lobby. Trabucco again insisted that he had never been there. Two officers then proceeded formally to arrest Trabucco, to advise him in Spanish of his rights, and to search him. They discovered in his rear pocket a piece of Sheraton-Tampa stationery with the name "Roberto Bravo, Ponce de Leon Hotel, Miami City" written on it. When the officers confronted him with this evidence, and administered *Miranda* warnings, Trabucco proceeded to outline the following incidents.

An individual named Alamido Baras had approached Trabucco in Chile apparently because of the Trabucco family's known financial straits and offered him $1,000 to take a package of cocaine to the United States. Trabucco agreed. He received the package in Tocopilla, Chile, and hid it in the stack of the ship —the Chilean Nitrate—on which he was a mechanic. Baras told Trabucco that an unidentified individual would board the Chilean Nitrate in Tampa Monday night, August 26, at twelve midnight.

When the appointed individual did board the ship in Tampa, Trabucco recognized him as Roberto Bravo, a Chilean he knew. Trabucco took the package and left the ship with Bravo. They went to the bus station, put the package in a "safety box", and proceeded to a bar. Bravo invited Trabucco to visit him at the Sheraton-Tampa Hotel the next day, August 27, around noon. When Trabucco arrived, Bravo was not there; Trabucco waited for him in the lobby. He finally saw Bravo about 3:30 p. m. The two men talked, then went to some stores on the main street in Tampa. When Trabucco asked Bravo for his payment, Bravo informed him that he could not produce the $1,000 until the ship reached Panama. Trabucco went back to the Chilean Nitrate, worked on board the following day, did some shopping in the afternoon, and apparently

---

1. Customs agents, narcotics agents, the local sheriff's department office, and the United States Attorney's office were involved in this investigation. We refer to these investigating agents collectively as officers.

2. After first testifying that she saw Trabucco with Roberto Bravo, Miss Pardo upon further consideration asked to be recalled. She then declared that the only basis she had for believing the man to be Bravo was the fact that he was of Latin extraction and was talking to Trabucco, who had asked for him. But the record indicates that at the time of the arrest Miss Pardo had informed the officers that she saw Trabucco talking with Bravo. We judge the arresting officers' conduct in accordance with what they reasonably believed at the time. Thus, events after the arrest will not furnish probable cause that was lacking at the time of the arrest, nor will later events remove probable cause that did exist when the arrest took place.

was prepared to leave port with the ship when he was arrested.

Trabucco was indicted, tried before a jury, and convicted of the illegal importation of cocaine and of conspiracy illegally to import cocaine. The district judge sentenced him to five years imprisonment with a recommendation to the Attorney General to deport Trabucco in lieu of incarceration.[3] Trabucco appeals from this conviction, contending that 1) probable cause did not exist for his warrantless arrest; 2) the piece of Sheraton-Tampa stationery with Bravo's name on it was therefore inadmissible as the product of an illegal search and seizure; 3) his oral confession and subsequent written admissions were inadmissible as the product of an illegal arrest, illegal search, and custodial interrogation without proper *Miranda* warnings; 4) the evidence is defective for failure to establish the corpus delicti independently of his confession; and 5) the district court's instruction on the presumptions to be drawn from the possession of cocaine constituted reversible error.

## II.

### *Probable Cause*

The Government admits that Trabucco was effectively arrested at the time the officers removed him from the Chilean Nitrate. We therefore examine the information available to the arresting officers as of that time to determine whether probable cause for the arrest existed.

The circumstances leading up to Trabucco's arrest show a course of concentrated investigation by law enforcement officers along with a few strokes of luck. The case began when Eastern Airlines employee Gloria Caruso became concerned about a telephone call she had taken while on duty at about 4:45 p. m. the afternoon of August 27, 1968. The caller, a Spanish-speaking man interested in an afternoon flight at 6:15 p. m. to New York City, had asked about the procedure for sending a package on the flight without himself travelling on the plane and about the identification necessary for picking up the package in New York. Miss Caruso took no chances. She notified her supervisor that if anyone brought out a package for the 6:15 flight to New York, the airline should be on the lookout for a bomb. Meanwhile, a Spanish-speaking man had indeed delivered a package to Eastern's Air Freight Office for this flight, fifteen minutes before flight time. This individual also wanted information about identification needed for retrieving the package in New York. Employees first placed the package on the aircraft, then upon instructions, removed it to a supervisor's office. When the package was finally opened, it turned out to be not a bomb, but glass cylinders containing five pounds of white powder later identified as cocaine. Law enforcement officers wrapped a small amount of the powder in a similar package and put it on a later flight to New York. The next morning, a federal narcotics agent in New York arrested Ramon Enrique Carjaval-Alfaro, a Chilean, who claimed the package at the airport.

Investigation in New York and in Tampa produced the following information. Carjaval-Alfaro, the Chilean who picked up the cocaine in New York, was registered at the Stanford Hotel in New York. He and Roberto Bravo had registered there together on August 23, 1968. Bravo had since gone to Tampa where he stayed at the Sheraton-Tampa on August 26, 1968, giving his address as Santiago, Chile. While at the Sheraton-Tampa, Bravo had called the Stanford Hotel in New York. Bravo checked out of the Sheraton-Tampa at 4:02 p. m. August 27, 1968. A taxi-cab took a man speaking only broken English and carrying a package to the Eastern terminal around five or shortly after. A Chilean ship had arrived in Tampa August 26, 1968, the same day that Bravo registered at the Sheraton-Tampa. It was

---

3. The district court was expressly precluded from suspending the sentence or providing probation by 26 U.S.C. § 7237 (d).

the only Chilean ship in port. Miss Sesylia Pardo, a Sheraton-Tampa employee who spoke Spanish, had been asked by a Spanish-speaking male of Latin extraction how to reach Roberto Bravo. She directed him to the room phone. She later observed this individual in the hotel lobby talking to another man of Latin extraction whom she believed or assumed to be Roberto Bravo.[4] Miss Pardo subsequently identified the defendant, Trabucco, from a spread of Polaroid photographs of the entire crew (thirty-six) of the Chilean vessel. The officers removed Trabucco from his ship.

■ In applying the standard of probable cause we determine whether "[t]he arresting officers * * * possess knowledge of facts and circumstances gained from reasonably trustworthy sources of information sufficient to justify a man of reasonable caution and prudence in believing that the arrested person has committed or is committing an offense". Miller v. United States, 5 Cir. 1966, 356 F.2d 63, 66, cert. denied, 384 U.S. 912, 86 S.Ct. 1357, 16 L.Ed.2d 365; Henry v. United States, 1959, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134, 138. That is not to say that the agent finally ordered to take Trabucco from the ship must himself have possessed all the information; we may impute to him the knowledge of his superiors. *See* Daniels v. United States, 1968, 129 U.S.App.D.C. 250, 393 F.2d 359, 361; Smith v. United States, 1966, 123 U.S.App.D.C. 202, 358 F.2d 833, 835, cert. denied, 1967, 386 U.S. 1008, 87 S.

Ct. 1350, 18 L.Ed.2d 448; United States v. Bianco, 3 Cir. 1951, 189 F.2d 716, 719. In this case, the agents could reasonably believe that an offense had been committed with regard to the shipment of the cocaine and that Bravo had initiated the shipment from Tampa to New York.[5] The harder problem is the inference of Trabucco's involvement.

■ The officers knew that a Chilean ·citizen, Roberto Bravo, who had previously been in New York, checked into the Sheraton-Tampa the same day a Chilean vessel arrived in port (the only Chilean vessel in port); that Trabucco, a Chilean seaman on that ship tried to contact Bravo the next day at his hotel and was seen with him there; and that Bravo airshipped a quantity of cocaine that day to be picked up by another Chilean citizen in New York with whom he had previously lived. This evidence certainly would never convict Trabucco on a charge of illegal importation or conspiracy. But as Brinegar v. United States, 1949, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890, instructs us,

In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.[6]

With this in mind, we conclude that the arresting officers could reasonably infer that Trabucco brought the cocaine to Bravo. This case furnishes us with more than the mere conversation with

---

4. *See* note 2 *supra.*

5. Trabucco makes much of some apparent inconsistencies such as the fact that at the hearing on the motion to suppress, witnesses differed in their estimations of the measurements of the package they had seen some three months previously and some Eastern employees believed the package to be addressed to "Diaz" while others believed "Perez". But our determination of probable cause is directed to the circumstances as the officers could reasonably believe them to be at the time of the arrest. We conclude that these investigating officers were justified in believing

that they were dealing with one individual and one package.

6. *Cf.* United States v. Cooperstein, D.Mass. 1963, 221 F.Supp. 522, 526 (Wyzanki, J.) (Emphasis omitted) :
    Ordinarily when the trustworthy evidence makes it clear that an offense has been committed and that a particular person was on the scene at the time it was committed, and the then available evidence makes it reasonable to infer that the particular person not necessarily was but may have been one of the offenders, most discreet and prudent men would order that person's arrest.

narcotics addicts that the Supreme Court found insufficient in Sibron v. New York, 1968, 392 U.S. 40, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917, to constitute probable cause for the offense of possession of narcotics. Here there was a shipment of cocaine by Bravo; it could reasonably be assumed that Bravo had obtained the cocaine in Tampa since he had come to Tampa from New York, then sent the drug back to New York; Trabucco and Bravo were both Chilean citizens neither of whom apparently spoke much English, arriving in Tampa the same day and meeting the next day; and Trabucco had arrived aboard a Chilean vessel, a ready means of importing the cocaine. By the time Trabucco had been identified, no time was left to secure a warrant before the ship sailed. But we conclude that probable cause existed for his warrantless arrest.[7]

Since Trabucco's only argument against the admissibility of the Sheraton-Tampa stationery is its seizure pursuant to an unlawful arrest, our conclusion that probable cause existed also disposes of that contention.

### III.

#### *Confession*

Since Trabucco's arrest and search were legal, the admissibility of his confessions hinges upon the propriety of the interrogation. Trabucco argues that the warnings given him were insufficient for "an ignorant Chilean seaman, who knew nothing about our laws and customs, much less our constitution", particularly when he was in custody and had been questioned and searched; that the evidence does not establish a knowing and intelligent waiver of his rights; and that the warnings were given too late.[8]

Officers boarded the Chilean Nitrate just before 9:00 p. m., removed Trabucco about 9:15 p. m., arrived at the sheriff's office about 9:35 p. m., and formally arrested Trabucco about 9:45 p. m. At the time of his formal arrest, a Spanish-speaking officer, reading from a card entitled "Warning of Constitutional Rights", gave Trabucco the following warnings in Spanish:

1. You have a Constitutional right to remain silent. You need not make any statements if you do not wish to do so.

2. Should you talk to me, any statement you may make can and will be used against you in Court.

3. If you want an attorney to be present at this time or at any time hereafter, you are entitled to such counsel. If you cannot afford to pay an attorney, we will furnish you with counsel if you so desire.

4. Do you wish to have an attorney present at this time?

5. Knowing your rights as they have been related to you, are you now willing to answer questions without having an attorney present?

At question 4, "Do you wish to have an attorney present at this time?", Trabucco shook his head and said "No". At question 5, "[A]re you now willing to answer questions without having an attorney present?", Trabucco answered "Yes". At that point, another officer proceeded to re-advise Trabucco in Spanish of his rights. He told Trabucco,

The Constitution requires that I inform you that you have the right to stay silent.

That anything that you may say may be used in court against you. You

---

7. We choose not to rely on another ground sometimes advanced as contributing to probable cause—the emergency character of the arrest. *See* Bailey v. United States, 1967, 128 U.S.App.D.C. 354, 389 F.2d 305, 309.

8. The district court found Trabucco's confessions to be voluntary and admissible under 18 U.S.C. § 3501. Since we conclude that they were also admissible under *Miranda* standards, we do not reach the question whether that section of the Crime Control Act and *Miranda* set conflicting standards and if so, which must prevail.

have the right to talk to a lawyer, and to have him present—and to have him present now or any other time during the interrogation.

If you don't have the money to pay the lawyer, one can be procured without any cost for you. Do you now want to have—to consult with a lawyer during the interrogation?

Do you understand this right? Do you want to talk with us at this moment about this matter?

Trabucco's response was that he understood his rights, did not want a lawyer, that he was willing to cooperate, wanted to "explain the whole thing" and to "get it out of his system". It was at this point that Trabucco made his first confession.

■ The Supreme Court established the *Miranda* requirements so that the courts would not have to

pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact.

Miranda v. Arizona, 1966, 384 U.S. 436, 468–469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694, 720.

Trabucco received a full-fledged *Miranda* warning. What he demands is a more stringent test than even *Miranda* provides, on the theory that the *Miranda* standards are not sufficient for his peculiar circumstances. This Court considered a similar contention in De La Fe v. United States, 5 Cir. 1969, 413 F.2d 543, where defendants of Cuban extraction contended that a language barrier hindered their understanding of constitutional rights. The Court noted that in fact the defendants there understood both English and Spanish. It reached its conclusion that their contention was unpersuasive, however, on the ground that where a *Miranda* warning had been

given and the record revealed without contradiction that each defendant "affirmatively acknowledged an understanding of the warnings given him", there was no burden on the Government to go further and prove that the accused fully understood the warning. *See* Morgan v. United States, 5 Cir. 1968, 405 F.2d 497. We reach the same conclusion. There is no evidence that Trabucco lacked sufficient understanding of his rights to be able intelligently to exercise them. We do not reach the question whether a *Miranda* warning is sufficient, if it is proved that by reason of different cultural conditioning an accused was unable to appreciate the import of his rights in an American interrogation.

Furthermore, we find that the record adequately establishes an effective waiver by Trabucco. *Miranda* recognized that "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver". 384 U.S. at 475, 86 S.Ct. at 1628. That is exactly what occurred here.

■ Trabucco's most substantial argument is that the *Miranda* warnings came too late—that his confession was produced as a result of pre-warning questioning. After Trabucco left the ship (the time of the conceded arrest) and before the warnings, he responded to questioning that he had visited town, that he had never been to the Sheraton-Tampa, and that he did not know Roberto Bravo. The conversation in the car on the way to the sheriff's office was innocuous. The questions posed and the answers received at the sheriff's office, however,—where Trabucco denied knowing Bravo or having been to the Sheraton-Tampa—present a more difficult problem.

*Miranda* states that "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'". 384 U.S. at 477, 86 S.Ct. at 1629. But *Miranda* spoke with regard to the Government's use of

the statements at trial. The Court there noted that "[i]f a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution". *Id.* That is not this case. Here, the Government did not use the exculpatory statements; they were elicited by defense counsel on cross-examination.

What Trabucco contends is that his pre-warning statements "committed [him] to a version of events from which he could not escape". He maintains that " 'but for' the illegal acts of the officers no confession would have been elicited", and that this taint required suppression of the confessions. To make Trabucco's argument explicit, the Sheraton-Tampa stationery caught him in a lie from which an inference of guilt might be drawn; his realization of this created a compulsion to confess which could not be cured by the *Miranda* warnings.[9]

This Court has construed the teaching of Westover v. United States, 1966, 384 U.S. 436, 494, 86 S.Ct. 1602, 16 L.Ed.2d 694, 735 (a companion case to *Miranda*), to be that

when there are multiple confessions, the lack of a proper warning before the first in-custody statement does not necessarily render inadmissible statements during interrogation after appropriate warning. The facts and circumstances of each case must be examined to determine the *existence and extent* of a causal relationship between the earlier, unconstitutional conduct and the later statement.

---

9. The following are typical accounts of what occurred:

Officer Cacciatore:
(Direct Examination)
"I had the piece and I showed it to him and I asked him what did he have to say now."
    \*    \*    \*    \*
Q.: " \* \* \* what did Mr. Trabucco say to you?"
A.: " 'I want to say something,' and with that he continued."

Customs Investigator Perez:
(Direct Examination)
"We searched him. We found a piece of paper and then he told us exactly how he became involved in this cocaine."
   \*    \*    \*    \*    \*
"He didn't say nothing after we found the piece of paper only that he was willing to help us out."
(Cross-Examination)
Q.: "What did you do when you found the paper?"
A.: "I asked him, 'I thought you didn't know Roberto Bravo.' "
Q.: "And what else"?
A.: "And that you had never been at the Sheraton."
Q.: "And what did the defendant say?"
A.: "He said, 'Let me sit down and tell you exactly what happened to me.' "

Inspector Salla:
(Direct Examination)
"We warned him of his rights. I asked him if he understood it. He said, 'Yes.' I said, 'Do you care to make an oral statement?' Before I could bring it out, he voluntarily said, 'I want to get the thing cleared out. I want to talk to you about it.' So he proceeded to talk about it."
   \*    \*    \*    \*    \*
(Cross-Examination)
Q.: " \* \* \* I believe you testified that Mr. Perez said 'I thought you told us that you didn't know Bravo.' "
A.: "Right."
Q.: "And 'I thought you told us you had never been to the Tampa Sheraton.' "
A.: "That's right."
Q.: "Is that correct?"
A.: "Right."
Q.: "And that at that point the defendant broke down and said he would tell you anything you wanted to know?"
A.: "That is correct."
   \*    \*    \*    \*    \*
Q.: "Inspector Salla, it is your testimony that Inspector Perez read him his rights from his card, he was searched, he was presented with a piece of paper, he said, 'I'll tell you,' after seeing it, he was asked, 'Didn't you tell us that you didn't know Bravo, didn't you tell us you had never been to the Sheraton?' At that point he told— is it your testimony he said, 'I'll tell you what you want to know'? Is it your testimony that you warned him?"
A.: "At that time I warned him of his rights again from this card in Spanish."

Testimony at the hearing on the Motion to Suppress was similar.

Gilpin v. United States, 5 Cir. 1969, 415 F.2d 638, 641–642 (emphasis added).

First, we observe generally that pre-warning exculpatory remarks need not be as damaging as a pre-warning confession. The compulsive effect of a once-given confession is that the cat is out of the bag. The accused "can never get the cat back in the bag. The secret is out for good." United States v. Bayer, 1947, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660. And despite *Miranda* warnings that intervene between two confessions, the accused may be unaware that the first confession cannot be used against him and consequently may attach no importance to its restatement. When the pre-warning remarks are exculpatory, however, there need be no such compulsion. The accused can cling to his exculpatory statement and refuse to say more. Or he can retreat from the exculpatory remarks and deny guilt by some other explanation. He never carries the burden of knowing he has already confessed. We state these considerations as prologue, for to satisfy *Miranda* the effect of pre-warning exculpatory remarks must be tested in the same manner as pre-warning confessions. We must examine the "facts and circumstances" of the case "to determine the existence and extent of a causal relationship".

In Trabucco's case, officers "entered the fray" armed not with an earlier admission by Trabucco [10] but with a prevarication. Yet even the discovery of prevarication did not let the cat out of the bag in the same sense that a confession would have. Trabucco could still adhere to his lie and refuse to say more. In fact, he did exactly that until the search produced the stationery. When he was told at his arrest, "You have been identified as the man that has been in the lobby of the Sheraton, talking to a man by the name of Roberto Bravo," he still "shook his head and he said, 'I have never been in there'". Only when the Sheraton stationery with Bravo's name was found in his pocket did he decide to confess. Trabucco must have assumed from the questions that the officers were aware of Bravo's role in the crime. We conclude that it was the discovery of the Sheraton stationery with Bravo's name, irretrievably linking Trabucco to Bravo, that convinced him he might as well confess. Being caught in the prevarication, if a factor at all, was not significant. Unlike a confession, it did not prove guilt but at most a guilty conscience—that Trabucco had reason to deny the relationship. The two *Miranda* warnings, administered first when he was arrested and then when he said he wanted to explain, provided an adequate cure to the influence of discovered prevarication. Trabucco could simply have refused to say more. He had not faced the compulsion of a lengthy interrogation. His remarks then and later (when a written statement was taken) indicate that it was not the lie which prompted him to talk but rather—once having been linked to Bravo—his resentment at having been duped, his desire to cooperate, and to get things cleared up.

This conclusion should continue to give adequate protection to the deterrent thrust of *Miranda*. It will not encourage law enforcement authorities to indulge in pre-warning questioning that can be used as a lever to secure a post-warning confession because, as we point out, a significant causal relationship will bring the confession within the *Miranda* exclusionary rule. On the other hand, we think it important not to prevent the police from curing, by appropriate warnings, a *Miranda* defect. Here, for example, though the Government now admits that as a legal question Trabucco was effectively arrested when he left the ship, the officers believed that they had not arrested him until Miss Pardo identified him in person at the sheriff's office. Upon his arrest, they promptly gave him entirely adequate warnings.

10. *See* Gilpin v. United States, 5 Cir. 1969, 415 F.2d 638, 642; United States v. Pierce, 4 Cir. 1968, 397 F.2d 128, 131.

## IV.

### Corpus Delicti

Trabucco contends that the Government's case must fall because it did not offer proof of the corpus delicti independent of his confession. *Wong Sun,* the chief case relied upon by Trabucco, does not go so far. The Supreme Court there recognized that its holdings required corroboration "which 'merely fortifies the truth of the confession, without independently establishing the crime charged * * *.'" Wong Sun v. United States, 1963, 371 U.S. 471, 489, 83 S.Ct. 407, 418, 9 L.Ed.2d 441, 456; *see* Opper v. United States, 1954, 348 U. S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101; Wright, Federal Practice and Procedure: Criminal § 414 at pp. 165–68 (1969). The Government's case was defective in *Wong Sun* because its only corroborating evidence was an unsigned confession by another alleged conspirator, a confession that was an out-of-court declaration after arrest and not admissible against any others in the conspiracy.

■ Here, however, evidence independent of the confession establishes that Trabucco arrived in Tampa on the Chilean Nitrate, from Chile, on August 26, and that the Narcotics Bureau had not issued the ship a permit; that Bravo registered at the Sheraton-Tampa the same day, August 26, having come from New York; that Trabucco knew Bravo and the hotel where he was staying; that Trabucco went to the Sheraton-Tampa and asked for Bravo; that Bravo attempted to airship a quantity of cocaine to another Chilean, Carjaval-Alfaro, in New York, an individual with whom he had previously stayed. Trabucco's confession dovetails perfectly with all these established facts and is sufficiently corroborated to be admissi-

ble. "We * * * prefer the less stringent and more reasonable requirement of corroboration of the statement itself, rather than proof of every element of the crime charged." Landsdown v. United States, 5 Cir. 1965, 348 F.2d 405, 409.

## V.

### Jury Instructions

Trabucco's final contention is that his conviction must be reversed because the judge instructed the jury that if they should find

that the accused had possession of a narcotic drug as charged, the fact of such possession alone, unless explained to your satisfaction by the evidence in the case, permits you to draw the inference and find that the narcotic drug was imported or brought into the United States of America contrary to law, and to draw the further inference and find that the accused had knowledge that the narcotic drug was imported or brought in contrary to law.

Turner v. United States, 1970, 396 U. S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610, holds that these statutory presumptions of illegal importation and knowledge thereof arising from simple possession of the drug are unconstitutional as applied to cocaine, because much more cocaine is lawfully produced in this country than is smuggled into the country. We do not reach the question whether that decision should be applied prospectively or retrospectively because we find that the instruction given was harmless error in this case.

■ Trabucco's confession was the only evidence from which the jury could find possession in this case. That same confession included all the elements of the crime.[11] Although there may be cas-

---

11. *Cf.* Turner v. United States, 1970, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610: Since the only evidence of a violation involving heroin was Turner's possession of the drug, the jury to convict must have believed this evidence. But part and parcel of the possession evidence and indivisibly linked with it, was the fact that Turner possessed some 275 glassine bags of heroin without revenue stamps attached. This evidence, without more, solidly established that

es where a jury might believe part but not all of a confession so that we would be unjustified in concluding that their reliance on part implied reliance on the rest, this is not such a case. We see no reason here to treat the confession as to possession of the cocaine any differently from the confession as to illegal importation; they are inextricably entwined. Consequently, we find that the error was harmless beyond a reasonable doubt. Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Chapman v. California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

We affirm the judgment of the district court.

Turner's heroin was packaged to supply individual demands and was in the process of being distributed, an act barred by the statute. * * * [T]he instruction on the presumption is beside the point since even if invalid, it was harmless error; the jury must have believed the possession evidence which in itself established a distribution barred by the statute.