**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Phillip Scott RAGSDALE, Defendant-**
**Appellant.**

**No. 71-3593.**

United States Court of Appeals,
Fifth Circuit.

Nov. 10, 1972.

Rehearing and Rehearing En Banc
Denied Jan. 17, 1973.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and RIVES and CLARK, Circuit Judges.

CLARK, Circuit Judge:

In this automobile search case we must strike a proper constitutional balance between the competing interests of society in the detection of crime and the individual's Fourth Amendment right to be left alone. The defendant, Phillip Scotty Ragsdale, was convicted of bank robbery. The pivotal evidentiary ruling related to monies discovered in the course of a warrantless search of Ragsdale's car on the highway after he had been stopped for a speeding offense. Viewing the totality of the circumstances present, we find the search to have been a reasonable one which did not offend the defendant's constitutional rights and we affirm.

The critical facts are not substantially disputed. On the occasion in question, the Texas Department of Public Safety had assigned Officers Jones and Mullens to work as a two-man, one-car team patrolling a stretch of highway in that state. At about 1:45 a. m. on a Christmas Eve morning, they observed the defendant Ragsdale operating a motor vehicle on a highway within the city limits of Houston, Texas at a speed estimated to be 90 miles per hour in a 55 mile per hour speed zone. On a flashing light signal from the patrol car, Ragsdale stopped his vehicle on the highway and the patrol car pulled up behind it. Both patrolmen got out of their vehicle and approached Ragsdale, who remained seated in his stopped car. Officer Jones, the lead officer on this occasion, asked Ragsdale to exhibit his driver's license. After erratic answers to preliminary questioning and observation of the bloodshot appearance of Ragsdale's eyes had aroused suspicion in Officer Jones' mind that Ragsdale might have been driving under the influence of alcohol or drugs, Jones requested Ragsdale to return with

Edward A. Mallett, Houston, Tex. (Court appointed), for defendant-appellant.

him to the patrol car for the purpose of preparing a speeding ticket. As Ragsdale got out of his automobile, Jones, who was standing nearby, saw the handle, hammer and a part of the cylinder of a pistol protruding from a paper sack on the floor board of Ragsdale's car near the front edge of the driver's seat. Officer Mullens, who was standing further toward the rear of Ragsdale's car, could not see the gun at that time. As Jones walked with Ragsdale past Mullens on the way to the patrol car, he whispered to Mullens that "[t]here was a gun under the front seat and I [Jones] was going to search [Ragsdale]." Jones' search of Ragsdale's person at the patrol car produced no weapon. Shortly after Ragsdale had been seated in the patrol car and Jones began the ticketing procedure, Mullens left these two men, went to Ragsdale's car, opened the door, and immediately saw a gun under the driver's seat. He then began a search of the remainder of the passenger area, which disclosed two more pistols and a quantity of money.

A preliminary motion to suppress this money was denied, and during the bank robbery trial proper the monies were introduced in evidence over Ragsdale's objection. At the hearing on the motion to suppress, Ragsdale and Officer Jones described the search of the vehicle on the highway. At the trial Officers Jones and Mullens both testified about this search, while Ragsdale did not take the stand.

■ The validity of the search, which up to now might appear justified on the basis of Jones' "plain view" of a weapon prohibited by Texas law,[1] is put in doubt because of Officer Mullens' own description of what motivated him to conduct the search. At no point did Mullens ever acknowledge that he heard Jones'

whispered statement about seeing the gun in Ragsdale's car[2] or assert a reliance on Jones' actions toward Ragsdale. The crux of the matter is best demonstrated by quoting the following excerpt from the cross-examination of Mullens by Ragsdale (who was then representing himself):

Q Mr. Mullens, why did you have reason to look for the pistols?

A In order that I would know that you didn't have a pistol of any kind that would be within your reach after you were allowed to return to your car.

Q When did you make this decision to go and search the car?

A After listening to the manner in which you—

Q No, no, no. When, not why?

A I said after a certain point of time, after I had heard you talking. [Mullens had previously testified on direct examination that he observed Ragsdale to be "blurry-eyed" and acting "erratic and strange."]

Q In relation to minutes, what, five ten minutes, three, fifteen, twenty minutes?

A After we were in the patrol car together. It was about three minutes.

Q You returned to the defendant's car to search as a safety precautionary search?

A Yes; yes, sir.

Q In order that when he returned to his automobile and might be mad at you, he wouldn't be able to get a pistol and shoot you or something?

A That or otherwise, yes, sir.

Q That is the way it goes. Was there any other reason?

A None that I knew of.

---

1. Vernon's Texas Penal Code Ann., art. 483 (Supp.1972).

2. If this knowledge of Jones had been communicated to his partner, it clearly would have justified Mullens' actions. Wood

v. Crouse, 436 F.2d 1077 (10th Cir. 1971); United States v. Trabucco, 424 F. 2d 1311 (5th Cir. 1970); and Smith v. United States, 123 U.S.App.D.C. 202, 358 F.2d 833 (1966).

■ Although it may be possible to conclude that the whisper by Jones was heard by Mullens and that this information encouraged the search, the whole of his testimony renders this conclusion so tenuous as to make it wholly improbable. We therefore do not base our holding in anywise on the supposition that Mullens may have heard Jones' whisper. Mullens further testified that he opened the door of Ragsdale's car and began his search prior to the time he saw any gun. So Mullens individually had neither "reliable informant" nor "plain view" cause to make the search. The mere fact that Mullens had knowledge of the speeding offense by Ragsdale would not, considered in isolation, support any right to search his vehicle. United States v. Adams, 424 F.2d 175 (5th Cir. 1970); Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968). *See also* Comment: Search Incident to Arrest and the Automobile, 43 Miss.L.J. 196 (1972). Thus, this search was not authorized as incident to the ticketing for speeding.

■ The Fourth Amendment does not forbid all, but only unreasonable searches. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Lipscomb, 435 F.2d 795 (5th Cir. 1970), cert. denied 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971). With this easily stated truism, the difficulties of specific application to the case at bar begin.

The resolution of search and seizure questions by lower courts (and by law enforcement officials) has been fraught with difficulty because precedents from the High Court are, with deference, ofttimes difficult to reconcile. Over the 183 years since the adoption of the Bill of Rights, the Court's decisions have, in the words of one of the Justices, been "unexplained and inexplicable." [3] The sparse words of the Fourth Amendment have produced a veritable sea of interpretative language. Some guide lights remain constant but other markers have moved with varying currents of reason. The most notable ebb and flow of precedents came in the area which alternately raised or submerged a separation of the Amendment's two basic clauses—the first, which proclaims a protection against unreasonableness in searches and seizures; and the second, which prevents the issuance of search warrants except upon a particularized showing of probable cause.[4] As we sight the beacons which guide today's legal navigation, they appear to favor a blending of the separate clauses by characterizing all warrantless searches as inherently unreasonable unless they fall within narrowly defined exceptions. The one of these exceptions which is pertinent to the facts of this case required probable cause to be coupled with exigent circumstances—meaning the existence of conditions which imperatively demand that the search proceed lest the delay necessary to obtain the magistrate's intervention present an immediate danger to the officer or permit the evanescent evidence of crime to be concealed or destroyed.

Furthermore, we are taught that automobile searches are to be distinguished from searches of buildings or other immovable places for analytical purposes, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The validity of such vehicle searches have never lent themselves to simple, sure, "litmus-paper" tests. United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The central requirement in each particular case is to examine the totality of the circumstances in the light of established Fourth

---

3. Per Mr. Justice White concurring and dissenting in Coolidge v. New Hampshire, 403 U.S. 443, 521, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See also* the lead opinion of Mr. Justice Stewart, 403 U.S. at 483, 91 S.Ct. 2022.

4. See Player, Warrantless Searches and Seizures, 5 Ga.L.Rev. 269 (1971); *see also* Hubbard, Auto Search: The Rocky Road from Carroll to Coolidge, 17 S.D.L. Rev. 98 (1972), and Landynski, The Supreme Court's Search for Fourth Amendment Standards, 45 Conn.B.J. 330 (1971).

Amendment principles, Chimel v. Calif., 395 U.S. 752, 765, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969), to determine if the rights which those principles embody have been violated and if the rigor of the exclusionary rule demands that "[t]he criminal is to go free because the constable has blundered."[5]

■ The validity of this warrantless automobile search is thus subject to the two conditions precedent: exigent circumstances and probable cause—neither of which can be supplied by anything which the search turns up. In a case such as the one at bar, where an automobile has been temporarily stopped on a highway and is subject to prompt removal by its owner, it has been held that exigent circumstances inhere as a matter of law. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). If probable cause to search also existed, then a search warrant was not requisite to the constitutional validity. The reason which supports this rule is that there is no meaningful difference between seizing and holding the car until such probable cause may be demonstrated to an impartial magistrate on the one hand, and carrying out an immediate warrantless search of the vehicle on the other. Chambers v. Maroney, *supra*; United States v. Miles, 445 F.2d 974 (5th Cir. 1971). In fact, the search-on-the-spot procedure is clearly calculated to cause less disruption to the people as a whole than would result from an unvarying policy of impoundment until a warrant be sought and served.

With these principles in mind, we turn to an examination of the totality of this encounter. Since a number of factors existing at this isolated spot during this brief nocturnal interlude were separately known to the two members of the assigned team, Officer Mullens and Officer Jones, we first look to what the searching officer, Mullens, alone knew.

This was not a minor or routine speeding violation—Ragsdale's vehicle had been proceeding at a recklessly dangerous rate almost twice the allowable limit. Ragsdale, who could give no good reason for having been traveling at such a high rate of speed, also appeared to him to be "blurry-eyed" and acted in a fashion he described as "erratic and strange." Lastly, Mullens knew his partner had demonstrated sufficient concern about the degree of danger present to make a personal search of Ragsdale's body before seating him in the patrol car.

But Mullens was not on duty alone. His partner, Officer Jones, knew that Ragsdale had bloodshot eyes and that his answers were erratic, which caused Jones to suspect Ragsdale might be using some sort of intoxicant or drug. Most importantly, Jones knew Ragsdale had a partially concealed weapon which not only would be within easy reach if Ragsdale were allowed to return to his driver's seat, but which Jones must have believed also constituted a violation of Texas law, as evidenced by his subsequent arrest of Ragsdale on this charge.

Considering the knowledge of the officers in individualized compartments, but in light of all that Mullens knew at the moment, we might determine that a reasonably prudent officer, situated as Mullens was, would be warranted in believing that his safety and that of his partner was in jeopardy. If this finding were made, it would follow he would be specifically and reasonably entitled to infer that the man who had been stopped in the wee hours of this holiday morning driving a motor vehicle at 90 miles per hour, should not be allowed to return to his automobile before a search had been made—at least of the areas within his ready reach. Once his search of this limited area had disclosed the illegal pistol under the driver's seat, Mullens was surely entitled to search the remainder of the passenger compartment of the vehicle for other weaponry. Nevertheless, all of this conceded, a monocular

5. People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926).

view of these events, looking only to those facts within the personal knowledge of Mullens, presents a close legal question as to probable cause to search. We do not reach or decide that precise issue.[6]

The test for validating such a search is set out in Terry v. Ohio, *supra*, thus:

[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, *where he has reason to believe that he is dealing with an armed and dangerous individual,* regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger . . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' *but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.* 392 U.S. at 27, 88 S.Ct. at 1883. (emphasis added).

It may be, as Judge Rives supposes in his special concurrence that what Mullens knew *should* have given him that

more-than-a-hunch reason to believe that he was dealing with an armed and dangerous man which the rule in *Terry* requires. The problem for that supposition for us is that in the course of his testimony Mullens was specifically interrogated as to what the facts he knew before he began his search actually caused him to infer. In addition to the matters set out in the quotation above, he flatly stated that he was then under the impression that Ragsdale would be ticketed for speeding and then allowed to leave in his vehicle. Here we are not presented with the situation which confronted the *Terry* court, or the more usual circumstance where it must be reasoned whether the searching official acted on mere unparticularized suspicion or the facts and circumstances adequately spelled out danger—we are furnished a brighter guide, the officer's own sworn testimony, which cuts off such a process of rationalization.[7]

 Ragsdale was, for this Christmas Eve moment in time, temporarily but lawfully isolated and detained to account for his dangerous speeding. Jones, tho not Mullens, had seen the partially concealed pistol in plain view without a search. Thus, Jones was duty-bound to make a search or cause one to be made to recover the evidence of what he reasonably believed to be a more serious crime against the laws of Texas. It simply

---

6. We note that a United States District Court has granted Ragsdale habeas corpus relief after determining that this same search was illegal. Ragsdale v. Kern, Civil No. 71–H–1132 (S.D.Tex. July 31, 1972). However, we further note that this finding was based upon the record of a trial in the County Criminal Court of Harris County, Texas at which only Officer Mullens testified and stated he conducted a "precautionary safety search" based solely on his observations of Ragdale's "actions and reactions." We expressly disclaim any prejudgment of the correctness of that ruling. The record basis of our actions here, where the court has the benefit of testimony from Ragsdale, Jones and Mullens, presents a distinctly different factual matrix.

7. The thrust of Judge Rives' concurrence is that we have unnecessarily created a dangerous exception to the exclusionary rule. In deference to his views the majority has reexamined the factual basis and legal concept set out above. While recognizing that the facts are novel, we adhere to our view that our holding does not jeopardize the right of the people to be secure from unreasonable searches. On the other hand, to hold that Mullens could search based only on what he knew seems to stretch beyond the limits of the cases which have applied the general rule laid down in *Terry*. Such a stretch may be constitutionally proper, but we opt to leave that question open and premise our decision on what is to us a more conservative and realistic approach.

cannot be gainsaid that such "plain view" information constituted probable cause to support a search. United States v. West, 460 F.2d 374 (5th Cir. 1972); United States v. Williams, 446 F.2d 486 (5th Cir. 1971); Walker v. Beto, 437 F.2d 1018 (5th Cir. 1971); Williams v. United States, 404 F.2d 493 (5th Cir. 1968). The question is by whom and when could such a search be made. If the knowledge of this team of officers is fragmented it could be contended that Jones, not Mullens, should be the only one allowed to search since he may have been the only one who knew this last, utterly conclusive fact.

If the possession of probable cause on the part of the searching officer were the alpha and the omega of our inquiry the answer might be different. However, logic requires that we refocus on the broader concept—reasonableness. Unless Jones was to be derelict in his duty, Ragsdale's car had to be searched and had to be searched before Ragsdale could be allowed to return to it, and had to be searched during the moments that he was properly detained at this solitary and detached location. If Mullens had not commenced the search when he did, Jones would surely have commanded it, or would have put Ragsdale in Mullens' custody and performed it himself. There is just no way to characterize this search when and where it was made in any manner other than a reasonable one. It invaded no Fourth Amendment protection which Ragsdale could claim.

■ Reasonableness—as its more usual concomitant, probable cause—is founded not on technicalities, but on "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 1925, 32 L.Ed.2d 612 (1972); United States v. Wysocki, 457 F.2d 1155 (5th Cir. 1972). Factually and practically the search at this precise point in time and space was mandated by Jones' view of Ragsdale's gun. The

fact that one member of the team moved too swiftly, which sometimes invalidates the result, should not thwart the proof of truth here where there existed a clear justification, and indeed demand, for the prompt search made. On this night and at this spot it would be hypertechnical to insist on bifurcating the knowledge of the officers and isolating Mullens from the realities of the existing situation.

■ Even if the knowledge of Mullens must be so isolated as to make his search an unreasonable one, the Chief Judge and the author of this opinion would nevertheless hold that the evidence discovered during the search was properly admitted in Ragsdale's bank robbery trial for an alternative and equally compelling reason. The exclusionary rule forbids the use of evidence obtained by an unlawful search, not because the evidence is not probative, or to chastise errant law officers or to benefit the accused, but to compel respect for the guaranty of the Fourth Amendment "in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960), quoted in United States v. Resnick, 455 F.2d 1127, 1132 (5th Cir. 1972). "Proper adjudication of cases in which the exclusionary rule is invoked demands a constant awareness of [its] limitations." Terry v. Ohio, *supra*, 392 U.S. at 14, 88 S.Ct. at 1876. *See also* Wright, Must the Criminal Go Free If the Constable Blunders? 50 Tex.L.R. 736 (1972).

In this case the search and its consequent fruits, the evidence of bank robbery, would imminently and lawfully have been made and discovered at this very time and place and by this team of officers even if Mullens had scrupulously regarded Ragsdale's Fourth Amendment rights and refrained from searching at the moment he did because Jones had the duty to conduct the search the moment he discovered Mullens had not received his whispered message. Had the exclusionary rule been effective to deter Mullens from making the search

it would have almost instantaneously gone forward under Jones' lawful direction. Thus, a technical application of the exclusionary rule would accomplish only one thing in the case at bar—the criminal would go free. Unless we were to presume the unlikely possibility that an officer would be encouraged to conduct an unlawful search on the faint hope that his partner possessed probable cause, no proper purpose of that rule would be served by denying to justice the truth which this search disclosed.

We deem this caveat appropriate. This reasoning cannot apply to a situation where the prosecution contends that a search should be sustained merely because sufficient facts were known to demonstrate probable cause to a magistrate and obtain a warrant. Here Jones already possessed ample authority to conduct the search. Nor would we have our ruling construed to provide support for the contention that a search by an officer citing only on his "inchoate and unparticularized suspicion" would be legitimized even if some other member of the force had fortuitously acquired a warrant for the same search just before it was made. In the exigent circumstances of this case one member of the law enforcement team at the scene of the search had probable cause and therefore lawful authority and the duty to search or cause the search to be conducted then and there.

■ Ragsdale next assigns as error the fact that a City of Houston police officer came to the jail in Humble, Texas (a town in the same county but outside of the city limits of Houston), and there took custody of Ragsdale and his property. In the course of this procedure the policeman made a warrantless search of Ragsdale's car. Coolidge v. New Hampshire, *supra*, raises serious questions as to the validity of such a procedure; such questions are academic in this case, however, since apparently the search revealed no evidence which was introduced in Ragsdale's trial. The monies put in evidence all came from the initial valid search of his car on the highway and from lawful searches of his person. Moreover, even if any of the evidence introduced at trial was discovered during this search it would have been merely cumulative and harmless beyond a reasonable doubt. The second automobile search, if illegal, was harmless to the defendant in this bank robbery trial.

■ The final error urged as to the admission of the evidence asserts the prosecution failed to prove the chain of custody of the funds obtained by the search from Ragsdale's car and person to the exhibit introduced at trial. Based upon the proof developed, there was ample evidence to make this a question of fact. Ragsdale argued the issue extensively to the jury. They resolved it against him. Thus, this assignment of error is also without merit.

After this cause was argued to the court, counsel for Ragsdale submitted a supplemental brief bringing to the court's attention the decision noted in footnote 6, above, and also urging for the first time that (1) the court erred in not allowing Ragsdale to obtain a copy of Mullens' testimony in the state court trial, and (2) Ragsdale's previous counsel must have been derelict in his duty because he apparently did not secure this valuable transcript. The record in this cause reflects that at the time Ragsdale discharged his prior court-appointed counsel in mid-trial, a careful record was made of all work papers and other written matter which this lawyer then turned over to the defendant. It reflects that a complete transcript of the State court trial in question, which Ragsdale had previously furnished to his counsel, was thereupon returned to him. His subsequent cross-examination of Officers Jones and Mullens, as well as Ragsdale's closing argument to the jury, reflects that he had and made full use of this document.

The judgment and commitment appealed from is in all respects

Affirmed.

RIVES, Circuit Judge (specially concurring):

I concur in the result but for different reasons. My colleagues say that, looking only to the facts within the personal knowledge of Mullens, this case presents a close legal question as to Mullens' probable cause to search, but they decline to decide that question, choosing instead to rely upon an unprecedented ground to sustain the reasonableness of the search. I feel that the totality of the circumstances known to Mullens: Ragsdale's blurry eyes, his erratic and strange behavior, the unusually high rate of speed, the late hour, and especially Jones' open frisking of Ragsdale after having had a better opportunity than Mullens to see inside the car; all combined to give Mullens probable cause to search the automobile for weapons.

After correctly emphasizing the significance of the "totality" of the encounter, my colleagues reject the obvious implications of the aggregate circumstances; and, instead, fashion a new and unnecessary deviation from the exclusionary rule. They evidently hold that, when a police officer who is a member of a team conducts a warrantless search of an automobile with no personal knowledge capable of generating probable cause, his search is reasonable if his partner did possess sufficient knowledge to constitute probable cause, although that knowledge was never communicated to the searcher. Such an on-the-scene-team exception to the exclusionary rule is fraught with conceptual difficulties and may be stretched to uncertain limits. Such a weakening of the exclusionary rule is not necessary in light of the more orthodox holding available to the court.

In my opinion, it would *not* be "hyper-technical to insist on bifurcating the knowledge of the officers." The mandate of the exclusionary rule is not directed to the collective intellect of an amorphous government entity, but to the individual searching officer. To be sure, the searching officer's knowledge may be coupled with further, complementary information possessed by other officers, but he must be alerted to the existence of the necessary information in others. Under the ruling of this case, the team's searching officer need have no reason to search, as long as his partner does, for the partner's knowledge is imputed to the searcher.

I am not nearly so certain as are my colleagues that, "If Mullens had not commenced the search when he did, Jones would have commanded it, or would have put Ragsdale in Mullens' custody and performed it himself." Jones' plain view of the pistol was probable cause for him to arrest Ragsdale on the charge of violating Article 483 of the Texas Penal Code. Such an arrest could have been made with safety after Jones' pat-down search revealed that Ragsdale was unarmed, and certainly after Ragsdale had been seated in the patrol car and had been interrogated by Jones in the presence of Mullens "for about three minutes." If Ragsdale had then been arrested for carrying the pistol partly concealed in the car, there would have been no doubt that the car could be validly searched as incident to that arrest. Instead, Jones chose merely to ticket Ragsdale for speeding. What Jones would have done if Mullens had not searched the car is, in my opinion, as unpredictable as what he did before the car was searched. I cannot, therefore, join my colleagues in holding that "Factually and practically the search at this precise point in time and space was mandated by Jones' view of Ragsdale's gun," nor can I agree with my colleagues that the exclusion of the evidence would not meet the purpose of the exclusionary rule even if Mullens had no probable cause to search the car. They express that opinion upon the factual assumption that "Had the exclusionary rule been effective to deter Mullens from making the search it would have almost instantaneously gone forward under Jones' lawful direction." For the reasons already stated, I disagree with that assumption of fact. Further, if that be correct, I would nonetheless think that the exclu-

sion of evidence obtained by an unlawful search made by Mullens would further the purpose of the exclusionary rule to require respect for the guaranty of the fourth amendment.

Such a roundabout approach is not needed for a finding that Mullens' search of the car was constitutionally reasonable. The existence of probable cause for the search is determined not solely by the state of mind to which Mullens testified, but also by an objective standard of reasonableness.

> "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

Terry v. Ohio, 1968, 392 U.S. 1, 21, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889. See also Brinegar v. United States, 1949, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 93 L.Ed. 1879. To the extent that there had been some order or communication of information passing from one officer to the other, probable cause should be evaluated on the basis of the collective information of the two officers rather than on the knowledge of only the officer who performed the search. Smith v. United States, 1966, 123 U.S.App.D.C. 202, 358 F.2d 833, 835, 836; United States v. Trabucco, 5 Cir. 1970, 424 F.2d 1311, 1315; see also Wood v. Crouse, Warden, 10 Cir. 1971, 436 F.2d 1077, 1078; United States v. Tijerina, 10 Cir. 1971, 446 F.2d 675, 679; White v. United States, 8 Cir. 1971, 448 F.2d 250, 254.

Mullens did not hear Jones' whispered warning. That much is clear. My colleagues find that when he made the search Mullens had knowledge of the following:

> "This was not a minor or routine speeding violation—Ragsdale's vehicle had been proceeding at a recklessly dangerous rate almost twice the allowable limit. Ragsdale, who could give no good reason for having been traveling at such a high rate of speed, also appeared to him to be 'blurry-eyed' and acted in a fashion he described as 'erratic and strange.' Lastly, Mullens knew his partner had demonstrated sufficient concern about the degree of danger present to make a personal search of Ragsdale's body before seating him in the patrol car."

I agree that Mullens knew of all these facts and circumstances, and to them I would add the following: Mullens knew that Jones had more opportunity than he to see inside Ragsdale's car. He could reasonably infer that Jones had some reason to be apprehensive when he requested Ragsdale to return with him to the patrol car for the purpose of preparing a speeding ticket. Unless he judged his partner harshly, Mullens must have reasonably inferred that Jones had cause to apprehend danger when he conducted a pat-down search of Ragsdale's person before permitting him to enter the patrol car, a greater indignity than the search of Ragsdale's car. That conduct was more forceful than a spoken message to Mullens that Jones had reason to think that Ragsdale might be armed and dangerous.[1] Under the totality of all of these facts, circumstances and inferences, it was reasonable for Mullens to want to "know that you [Ragsdale] didn't have a pistol of any kind that would be within your reach after you were allowed to return to your car." The facts and circumstances within Mullens' personal knowledge, and those conveyed to him by Jones' conduct and the reasonable inferences to be drawn from those facts and circumstances, all added together meet the test of Terry v. Ohio, quoted in Judge Clark's opinion.

For the reasons stated, I would avoid any holding based on imputation of

---

1. Evidence of Jones' plain view of the partially concealed gun in the automobile was relevant and needed to prove the reasonableness of Jones' conduct in frisking Ragsdale.

knowledge between the team members or on an assumption that Jones would have searched the car if Mullens had not done so, and, instead, would decide the issue which my colleagues pretermit. I would hold that Mullens had probable cause to make a reasonable search of Ragsdale's car for weapons. I therefore concur specially.