639 P.2d 365

**The STATE of Arizona, Appellee,**

v.

**Joseph Anthony OCHOA, Appellant.**

**No. 2 CA–CR 2387–2.**

Court of Appeals of Arizona, Division 2.

Nov. 25, 1981.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Mary E. White, Tucson, for appellant.

## OPINION

BIRDSALL, Judge.

Appellant was convicted of attempted second-degree burglary, second-degree burglary, and theft of property with a value greater than $100, each with two prior felony convictions. He was sentenced to concurrent presumptive terms of 10, 11.25, and 10 years, respectively. He contends on appeal that evidence discovered after his arrest should have been suppressed because the arrest was made without probable cause. We disagree and affirm.

Appellant's arrest was the culmination of a surveillance of several hours duration, conducted by a special surveillance team comprised of officers from the Pima County Sheriff's Department and the Tucson Police Department. The surveillance unit was organized by those agencies in response to rising rates of residential burglary in metropolitan Pima County. It operates by gathering and evaluating information from various sources tending to identify particular persons as active burglars, then by watching the activities of the identified suspects in an effort to apprehend them during or immediately after their crimes. In this case, the officers apprehended appellant and his co-defendant, Roy Hernandez, with the fruits of their crime literally "in hand."

Some two or three weeks before the arrest, Sergeant Mayer was informed by another officer of an informant's tip indicating that appellant was a burglar. This information was consistent with the sergeant's personal knowledge of appellant's criminal background.[1] Mayer and another sergeant, Grimshaw, therefore decided to commit the resources of their surveillance unit to an observation of appellant's activities.

1. The prior convictions found by the jury were 1977 and 1978 convictions for attempted burglary, burglary, and grand theft.

The surveillance began early on the morning of December 10, 1980. Officers watched appellant's house until he was picked up by Hernandez, who was driving a gold Buick. Using unmarked cars and an airplane, the officers followed the two men from the west side of Tucson to a house on Golf Links Road, on the far east side of town. Officer Sainz, watching from the airplane, saw the doors of the Buick open, but could not tell from his altitude whether either of the car's occupants went to the house. An officer on the ground did see the men approach the front of the house on foot, but lost sight of them as they went to the front door. Three to five minutes later the Buick pulled away from the house and the officers on the ground checked the house for signs of forcible entry. They found that the front door had been pried open. The house, however, appeared to be vacant and it did not appear that it had contained anything to be taken.

The surveillance continued, and Officer Sainz watched from the airplane as the Buick travelled by a circuitous route to a house on King Street on Tucson's far northeast side. The car remained there for ten minutes or longer, then departed. From the airplane, Officer Sainz was unable to see whether appellant or Hernandez had left the car, but officers on the ground again found that the front door of the house had been pried open. This time they also found that the master bedroom of the house had been ransacked. Drawers were pulled out, clothing was cast about the room, and an empty jewelry box lay on the floor. As they had done at the Golf Links incident, the officers reported their observations to other members of the surveillance team by radio.

Sergeant Grimshaw followed the Buick as it departed from the King address. A few blocks away, the Buick stopped in an open lot next to a convenience market. Having decided to make an arrest for burglary, Grimshaw approached the car on foot and saw appellant and Hernandez examining several pieces of jewelry. With assistance from other officers, Grimshaw arrested the two men for burglary. Other officers then impounded the Buick, obtained a search warrant, conducted a search of the car, and seized the evidence appellant claims should have been suppressed.

The officers engaged in the surveillance were in radio contact throughout the operation and reported all their observations to each other. It is therefore clear that the officers who participated in the entire surveillance had probable cause to believe that appellant had committed burglary. The problem pointed out by appellant arises from the fact that Sergeant Grimshaw, who actually effected the arrest, had not participated in the early stages of the surveillance and was unaware of his subordinates' observations at the first address. Appellant argues that knowledge of those observations, which would show his presence at two crime scenes instead of only one, was essential to establish probable cause to arrest for the second crime. He therefore contends that Sergeant Grimshaw did not have probable cause for an arrest.

■ The state's position is that probable cause for the arrest was established by the collective knowledge of all the officers involved in the surveillance, and that Grimshaw's personal knowledge should not be considered in isolation. *See State v. Richards*, 110 Ariz. 290, 518 P.2d 113 (1974); *State v. Sardo*, 112 Ariz. 509, 543 P.2d 1138 (1975); *State v. Smith*, 110 Ariz. 221, 517 P.2d 83 (1973). Generally, probable cause may be based upon the collective knowledge of law enforcement officers only when the officer who takes action correctly believes or has reason to believe that other officers have knowledge which justifies the action. E.g., *State v. Mickelson*, 18 Or.App. 647, 526 P.2d 583 (1974). This allows officers to rely upon the conclusions of other officers without questioning the details of the knowledge from which those conclusions are drawn. *Whitley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). It does not allow officers to make arrests without probable cause simply because some other officer, somewhere, has probable cause to arrest. *Mickelson, supra.*

Here, strict application of the doctrine would preclude consideration of the officers' collective knowledge because Sergeant Grimshaw candidly testified that he had been unaware that members of his surveillance unit knew any more than he about appellant's activities.

Several courts have developed a small exception to the requirement that the arresting officer act with awareness of other officers' knowledge. Where some members of a single police unit have possessed probable cause to search or arrest, those courts have held that a search or arrest will not be found unlawful simply because a member of the team having less knowledge than the others moved too quickly and did what the more knowledgeable members of the team would imminently and lawfully have done. *United States v. Ragsdale,* 470 F.2d 24 (5th Cir. 1974); *People v. Carney,* Cal.App., 172 Cal.Rptr. 430 (1981); *People v. Maldonado,* 76 A.D.2d 691, 431 N.Y.S.2d 580 (App.Div. 1980). The reasoning of those decisions has considerable appeal here, since appellant was being followed by a number of officers who clearly had probable cause to arrest him, who were duty-bound to do so, and who arrived at the scene of the arrest almost simultaneously with Grimshaw. It would seem hypertechnical to hold that appellant's arrest was unreasonable simply because the race to his location was won by the only officer of all involved who did not know about the Golf Links incident.

■ In this case, however, it is not necessary to determine whether the knowledge of the other officers may be imputed to Grimshaw, because we find that the facts personally known to Grimshaw were sufficient to establish probable cause. He knew that appellant had been selected for surveillance because of his reputation as a burglar, a "practical consideration of everyday life" which could be relied upon to guide the officer's interpretation of other facts known to him. *See United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). He knew that this reputed burglar had just spent a short time at the King address, that an examination of the house

immediately after appellant's departure had revealed signs of forcible entry and theft, and that appellant and Hernandez were inspecting likely fruits of a burglary when he approached them only a few minutes later. These facts were themselves sufficient to warrant a reasonable belief that appellant had just committed burglary.

■ Even if we were to find otherwise, however, we would not reverse. In arguing for the suppression of the disputed evidence, appellant has assumed that the "fruit of the poisonous tree" doctrine would require suppression if the arrest were found to have been unlawful. That doctrine, however, requires more than a mere chronological succession of events as a prerequisite to suppression. Later-discovered evidence is "tainted" by a primary illegality only if that evidence was come upon by exploitation of the illegality, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and even where a primary illegality has been established, the accused bears the initial burden of showing that the disputed evidence is "tainted." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1938); *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

■ The disputed evidence here was obtained under authority of a search warrant. The warrant itself has not been challenged, and neither the warrant nor the supporting affidavit has been made a part of the record. Viewed in light of testimony given at the suppression hearing, appellant's own version of the facts upon which the warrant was issued reveals that the underlying probable cause was established by facts known to the police before appellant was arrested. In short, the record before us contains no evidence to support a finding that the items admitted at appellant's trial were obtained by exploitation of the arrest, even if the arrest was unlawful. On the other hand, it does contain support for a finding that the lawful discovery of those items was both imminent and inevitable notwithstanding the actions of Sergeant Grimshaw, so that the items would have

been admissible even if they had been "tainted." *State v. Lamb*, 116 Ariz. 134, 568 P.2d 1032 (1977).

Affirmed.

HATHAWAY, C. J., and HOWARD, J., concur.