NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JEROMY FRANCIS HURLBURT,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11999
Trial Court No. 3KN-12-431 CR

O P I N I O N

No. 2601 — June 1, 2018

Appeal from the Superior Court, Third Judicial District, Kenai, Carl Bauman, Judge.

Appearances: Olena Kalytiak Davis, Attorney at Law, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Michael Sean McLaughlin, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge ALLARD.

Jeromy Francis Hurlburt was the driver of a motor vehicle that veered off the road and onto a bike path, seriously injuring two female joggers. During the

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

investigation that followed, the lead investigating officer erroneously told Hurlburt that he was required to submit to a blood test because he had caused an injury accident. In response, Hurlburt expressed concern about what the blood test might show and he told the officer that he had used methamphetamine "for the first time" four days earlier. Based, in part, on this statement, the officer administered field sobriety tests to Hurlburt. Hurlburt failed the field sobriety tests, and was then arrested for driving under the influence. A later blood test revealed significant amounts of methamphetamine in Hurlburt's system.

Prior to trial, Hurlburt's attorney moved to suppress Hurlburt's statements regarding his prior drug use and the results of the blood test. Hurlburt argued that this evidence should be suppressed as the fruit of an unlawful seizure — an unlawful seizure that he contended occurred when the officer erroneously told him that he was required to submit to a mandatory blood test. Hurlburt also argued that the officer lacked reasonable suspicion to conduct the field sobriety tests that led to his arrest, and the blood test results should also be suppressed on that basis. The superior court rejected both of these arguments and denied Hurlburt's motion to suppress. Hurlburt was later convicted, following a jury trial, of driving under the influence and two counts of first-degree assault (for recklessly causing serious physical injury to the two joggers by means of a dangerous instrument).[1]

On appeal, Hurlburt challenges the superior court's denial of his motion to suppress. For the reasons explained here, we conclude that the officer's mistaken statement about the mandatory blood test did not result in an unlawful seizure. We also conclude that there was reasonable suspicion to conduct the field sobriety tests.

---

[1]   AS 11.41.200(a)(1).

Accordingly, we uphold the superior court's denial of Hurlburt's suppression motion, and we affirm Hurlburt's convictions.

*Background facts and prior proceedings*

On March 21, 2012, Jeromy Hurlburt was driving on Kalifornsky Beach Road, a short distance from its intersection with the Sterling Highway. As Hurlburt's car approached a curve in the road, Hurlburt drove straight ahead — crossing the center line, and cutting off an oncoming driver. Hurlburt's car then continued in a straight line off the road and onto a bike path, striking and seriously injuring two women who were jogging on the path.

There was no apparent explanation for this accident. The driving conditions were not hazardous, and the road was not icy. Witnesses to the accident later reported that it looked as though the driver had simply failed to follow the curve of the road.

Sergeant Stace Escott of the Soldotna Police Department and Sergeant Eugene Fowler of the Alaska State Troopers were among the first officers to respond to the accident scene. Sergeant Escott took the lead in the investigation, which included coordinating the medical response, securing and documenting the site, and interviewing the witnesses at the scene before they left.

After speaking to the victims and collecting the names of some of the witnesses who saw the accident, Escott asked Hurlburt what happened. Hurlburt claimed that the accident was caused by a simultaneous failure of several mechanical systems in his car. Hurlburt told Escott that, as he was driving, he felt or heard something break in his car and, immediately afterwards, the steering on the car locked up, the gas pedal locked up, and the brakes locked up. Hurlburt said that there was nothing he could do to stop the car or to steer it back onto the road.

– 3 – 2601

During Hurlburt's initial interaction with Escott, Hurlburt was shaking and he appeared highly emotional. But Escott did not detect the smell of alcohol, and he considered Hurlburt's emotional behavior to be appropriate to the situation. At the evidentiary hearing, Escott testified that he did not think that Hurlburt was impaired at that time.

However, Escott believed (erroneously) that Alaska law required Hurlburt to submit to a mandatory blood test based solely on the fact that Hurlburt had caused a serious injury accident. (The other officers at the scene also appeared to be under the same mistaken impression.)

This mistaken view of the law was likely based on an overly literal reading of AS 28.35.031(g). This subsection of Alaska's "implied consent" law provides, in relevant part:

> A person who operates or drives a motor vehicle in this state shall be considered to have given consent to a chemical test or tests of the person's breath and blood for the purpose of determining the alcoholic content of the person's breath and blood and shall be considered to have given consent to a chemical test or tests of the person's blood and urine for the purpose of determining the presence of controlled substances in the person's blood and urine if the person is involved in a motor vehicle accident that causes death or serious physical injury to another person.[2]

In *State v. Blank*, however, the Alaska Supreme Court held that it would be unconstitutional to require a defendant to submit to a chemical test based only on the fact

---

[2] AS 28.35.031(g) ("The test or tests may be administered at the direction of a law enforcement officer who has probable cause to believe that the person was operating or driving a motor vehicle in this state that was involved in an accident causing death or serious physical injury to another person.").

that the defendant caused a serious injury accident.[3]  Instead, three other requirements must also be met: (1) there must be probable cause to arrest the defendant for driving under the influence — although the arrest need not be contemporaneous; (2) there must be case-specific exigent circumstances that preclude the police from timely applying for and obtaining a warrant for the chemical test;[4] and (3) the chemical test must be performed in a "reasonable manner."[5]

The constitutional principles the Alaska Supreme Court relied on in *Blank* were established in *Schmerber v. California*, a 1966 decision by the United States Supreme Court.[6]  More recent United States Supreme Court decisions have further restricted the circumstances under which the police can lawfully obtain a warrantless blood test.  In *Missouri v. McNeely*, the Court held that the natural dissipation of alcohol or controlled substances in a person's system did not create a *per se* exigency justifying a warrantless blood test.[7]  And in *Birchfield v. North Dakota*, the Court held that warrantless breath tests, but *not* warrantless blood tests, could be administered under the search incident to arrest exception to the warrant requirement.[8]

---

[3]  *See State v. Blank*, 90 P.3d 156, 160-62 (Alaska 2004); *see also Blank v. State*, 3 P.3d 359, 369-370 (Alaska App. 2000).

[4]  *Id.*

[5]  *Id.*

[6]  *See Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

[7]  *See Missouri v. McNeely*, 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013).

[8]  *See Birchfield v. North Dakota*, __ U.S. __, 136 S.Ct. 2160, 2185, 195 L.Ed.2d 560 (2016) ("Because breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving.").

The Alaska Supreme Court issued *Blank* in 2004. However, the legislature has never acted to modify the statutory language of AS 28.35.031(g) to reflect the constitutional limitations recognized in *Blank*. As a result, the burden falls on the police to be aware of those limitations on their authority, notwithstanding the literal language of the implied consent statute.

Here, the record shows that Sergeant Escott was not aware of the constitutional requirements for obtaining a warrantless blood test. Escott therefore told Hurlburt that he would be required to submit to a mandatory blood test as part of the investigation into the cause of the accident. In response, Hurlburt expressed concern about what the blood test might show, and he admitted to Escott that he had smoked marijuana five days earlier and that he had tried methamphetamine "for the first time" four days earlier. Hurlburt denied taking any drugs or being under the influence at the time of the accident.

Based, in part, on Hurlburt's admission to recent illegal drug use, Sergeant Escott made the decision to administer field sobriety tests to Hurlburt. Escott later testified at an evidentiary hearing that he made the decision to administer field sobriety tests based on the "totality of circumstances" known to him, which included (1) the suspicious nature of the accident, (2) an earlier comment by Trooper Fowler to Escott that Hurlburt was likely "good for something," and (3) Hurlburt's statements about his prior illegal drug use.

Trooper Fowler's comment to Escott about Hurlburt being "good for something" occurred relatively early in the investigation. While Sergeant Escott was busy coordinating the investigation and the medical response, Trooper Fowler was able to independently observe Hurlburt's actions and demeanor. Based on those observations, Trooper Fowler believed that Hurlburt was likely under the influence of a controlled substance, probably a stimulant:

And while I was watching him it — he seemed to not be able to stand still. He was pacing back and forth. He was swinging his arms. His movements — he — he was touching his face. Seemed to be continually doing this repetitive type behavior. He was wringing his hands. He appeared to be very nervous and — and his movements were — were exaggerated in nature and they seemed to be without stop.

Trooper Fowler attempted to communicate his suspicion about Hurlburt's impairment by telling Sergeant Escott that Hurlburt "look[ed] like he'd be good for something."

At the evidentiary hearing, Trooper Fowler testified that he gestured to Hurlburt when he made the comment "good for something," and his intent was to draw Escott's attention to Hurlburt's odd behavior and to alert Escott to the need for further investigation of Hurlburt's suspected impairment.

Sergeant Escott admitted, however, that he did not initially ascribe any significance to Trooper Fowler's comment. At the evidentiary hearing, Escott testified that the comment did not give him "any pause or concern" when it was made, and did not make Escott revise his earlier impression that Hurlburt was not impaired. However, he also testified that, after Hurlburt admitted to using methamphetamine, everything started to "add up in [Escott's] mind" and the need for field sobriety tests became clear.

Hurlburt failed the field sobriety tests, and was then arrested for driving under the influence. Following the arrest, Escott applied for a search warrant to test Hurlburt's blood for controlled substances.

However, when Escott presented his search warrant application to the on-call Anchorage magistrate judge, the magistrate judge told Escott — erroneously — that there was no need for a warrant because the police already had the authority to administer a warrantless blood test to Hurlburt under AS 28.35.031(g). Based on this erroneous advice, Escott transported Hurlburt to the hospital, where a nurse drew

Hurlburt's blood. The nurse later testified that Hurlburt had fresh needle marks on his arm. The blood test revealed significant amounts of methamphetamine in Hurlburt's system.[9] At trial, the State's expert testified that the level of methamphetamine in Hurlburt's system was inconsistent with his claim that he used methamphetamine "for the first time" four days earlier.

Prior to trial, Hurlburt's defense attorney moved to suppress the blood test results on three separate grounds. The defense attorney argued first that Hurlburt was unlawfully "seized" when Sergeant Escott erroneously told him that he would have to submit to a mandatory blood test, and he asserted that the blood test results (and his statements to Escott) should be suppressed as the fruit of this unlawful seizure. The defense attorney argued next that Sergeant Escott lacked reasonable suspicion to conduct the field sobriety tests because Sergeant Escott did not personally observe any signs of impairment, and he asserted that the blood test results should be suppressed as the fruit of that unlawful search. Lastly, the defense attorney argued that the warrantless blood test was itself unconstitutional because there was clearly time to obtain a warrant — even though the magistrate judge erroneously refused to issue one.

The superior court rejected all three grounds for suppression and denied Hurlburt's motion to suppress in a written order.

Hurlburt's case then went to trial. At trial, the State relied on the results of the blood test, Trooper Fowler's observations of Hurlburt's erratic behavior, Hurlburt's inability to pass the field sobriety tests, and the nurse's observations of fresh needle tracks on Hurlburt's arm. The State also presented expert testimony from mechanics who had examined Hurlburt's car and concluded that the accident was not caused by any mechanical failures, as Hurlburt had claimed.

---

[9] The blood test also revealed the presence of inactive marijuana metabolites.

Hurlburt's defense was that he was sober at the time of the accident, but that he had orally ingested methamphetamine after the accident happened in an ill-conceived attempt to keep the police from discovering the methamphetamine in his car.

The jury rejected this defense and convicted Hurlburt of driving under the influence and two counts of first-degree assault (one count for each victim) for recklessly causing serious physical injury by means of a dangerous instrument. As a third felony offender, Hurlburt faced a presumptive range of 15 to 20 years on each first-degree assault conviction.[10] At sentencing, the trial court imposed a composite sentence of 19 years and 9 months to serve.

This appeal followed.

*Hurlburt's claims on appeal*

On appeal, Hurlburt renews his claim that he was "unlawfully seized" when Sergeant Escott erroneously told him that he was required to submit to a blood test. Hurlburt also renews his claim that Escott lacked reasonable suspicion to conduct the field sobriety tests that led to Hurlburt's arrest.[11] We find no merit to either claim.

As the State correctly points out, Hurlburt was not subjected to an "unlawful seizure" when Sergeant Escott erroneously told him that he would have to submit to a blood test because Hurlburt was already "seized" for purposes of the Fourth Amendment long before Escott made this erroneous statement.[12] As the driver of a motor vehicle who had just caused a serious accident that had resulted in serious injuries

---

[10]    *See* former AS 12.55.125(c)(4) (pre-2016 version).

[11]    Hurlburt does not renew his claim that the warrantless blood test was independently unconstitutional.

[12]    *Pooley v. State*, 705 P.2d 1293, 1305 (Alaska App. 1985).

to two pedestrians, Hurlburt was not free to leave the accident scene until he had complied with his obligations to provide various information mandated by law, and the police had completed that portion of the investigation. The testimony at the evidentiary hearing makes this clear. Sergeant Escott and Trooper Fowler both testified that, although Hurlburt's movements were not closely supervised, they were both watching Hurlburt to make sure that he did not leave. Contrary to Hurlburt's contention, Sergeant Escott's statement about the mandatory blood test did not result in an unlawful seizure, instead it took place within an ongoing investigative stop in which Hurlburt had already been lawfully seized.

Nor is there anything to suggest that Sergeant Escott's erroneous statement about the mandatory blood test unlawfully extended this investigative stop. Indeed, the recording of the investigative stop indicates that the police were still collecting basic information from Escott — such as the identity of the legal owner of the car and how to reach the owner — at the time this statement was made.

There is likewise no reason to believe that the investigative stop in this case would have ended without any further investigation of Hurlburt's suspected impairment. Indeed, in many respects, Hurlburt's case closely resembles a Fifth Circuit case, *United States v. Ragsdale*, that is discussed approvingly in Professor LaFave's treatise on Fourth Amendment search and seizure.[13]

Like the present case, *Ragsdale* involved two law enforcement officers working closely together as a team during an investigative stop.[14] One of the officers noticed a gun on the floor of the defendant's vehicle and alerted (or, rather, tried to alert)

---

[13]   *See United States v. Ragsdale*, 470 F.2d 24, 30 (5th Cir. 1972); *see also*, 2 Wayne R. LaFave, *Search and Seizure* § 3.5(c), at 356 (5th ed. 2012) (discussing *Ragsdale*).

[14]   *Ragsdale*, 470 F.2d at 25-26.

the other officer to the gun.[15] The other officer subsequently opened the door of the vehicle and found the gun.[16] It later turned out, however, that the officer who opened the door had not heard the first officer's comment about the gun.[17] The Fifth Circuit nevertheless upheld the search as lawful because it concluded that if the second officer "had not commenced the search when he did, [the first officer] would surely have commanded it, or would have put Ragsdale in [the second officer's] custody and performed it himself."[18] In his discussion of *Ragsdale*, Professor LaFave cautions against overuse of this "inevitable discovery" or "inevitable communication" rationale.[19] But he also concludes that "given the rather unusual facts presented in *Ragsdale*, the above result is not open to serious question."[20]

We come to a similar conclusion based on the unusual facts presented here. That is, we conclude that had Sergeant Escott not conducted the field sobriety tests when he did, Trooper Fowler would have realized that his attempt to communicate his suspicions about Hurlburt's impairment to Escott had failed, and Fowler would have either made clear to Escott that field sobriety tests were required or he would have conducted the field sobriety tests himself. In either case, however, the investigative stop would not have been over until further investigation of Hurlburt's level of impairment occurred.

---

[15] *Id.* at 26.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 30 (concluding that the search of the vehicle "invaded no Fourth Amendment protection which Ragsdale could claim").

[19] 2 Wayne R. LaFave, *Search and Seizure* § 3.5(c), at 356-58 (5th ed. 2012).

[20] *Id.* at 356.

For somewhat similar reasons, we find no merit to Hurlburt's challenge to the reasonable suspicion ruling in this case. Reasonable suspicion to conduct field sobriety tests exists when an officer has a "particularized and objective basis" for suspecting that a motorist is under the influence of either alcohol or a controlled substance.[21] Here, Escott testified that he made the decision to conduct field sobriety tests based on (1) the suspicious nature of the accident, (2) Trooper Fowler's statement about Hurlburt being "good for something," and (3) Hurlburt's admission regarding recent illegal drug use.

On appeal, Hurlburt contends that Trooper Fowler's comment "good for something" could not be considered as part of the totality of circumstances justifying the field sobriety tests. We disagree. Although the record indicates that Escott did not immediately understand the meaning of this comment when it was first made, the record also suggests that Escott started to appreciate its significance after Hurlburt admitted to his recent drug use. Moreover, if nothing else, Escott was aware that Fowler had significant suspicions about Hurlburt that would need to be followed up on before the investigation could be considered complete. Given this, we conclude that the existence of this communication (however poorly understood) could nevertheless be considered as part of the "totality of circumstances adding up in [Escott's] head" that led to the decision to conduct field sobriety tests.

We note, however, that this is a different rationale than the one relied on by the State. On appeal, the State contends that Trooper Fowler's observations of Hurlburt's impairment could be directly imputed to Escott "under the long-standing principle that information in the possession of one law enforcement officer is attributable

---

[21] *See Galimba v. Anchorage*, 19 P.3d 609, 612 (Alaska App. 2001); *McCormick v. Anchorage*, 999 P.2d 155, 160 (Alaska App. 2000).

to another." In support of this purported "long-standing principle," the State cites our decision in *State v. Prater*.[22] According to the State, *Prater* stands for the principle that any relevant information in one law enforcement officer's possession is automatically imputed to the investigating officer, even if that information was never actually communicated to the investigating officer.

But our holding in *Prater* is much narrower than the State recognizes. The question presented in *Prater* was whether a patrol officer who stopped a suspected drunk driver based on a police bulletin had to be personally aware of the factual basis for the police bulletin or whether it was sufficient that the dispatcher who issued the bulletin had the necessary factual basis for the requested investigative stop.[23] In accordance with the United States Supreme Court's decision in *United States v. Hensley*, we held that an investigative stop made in objective reliance on a police bulletin is justified if the dispatcher or officer who initiated the bulletin possessed reasonable suspicion of imminent public danger justifying the stop.[24]

*Prater* therefore stands for the basic legal principle that law enforcement officers who act at the directive or request of other law enforcement officers do not violate a defendant's protected constitutional rights — provided that the law enforcement officer or agency issuing the directive or request has the requisite factual basis for the

---

[22] *State v. Prater*, 958 P.2d 1110, 1111-12 (Alaska App. 1998).

[23] *Id.*

[24] *Prater*, 958 P.2d at 1113 (internal citations omitted); *see also United States v. Hensley*, 469 U.S. 221, 231 (1985) (holding that an investigative stop based on a wanted flyer or police bulletin should be upheld if (i) the officer who conducted the stop acted "in objective reliance" on the flyer or bulletin, (ii) the officer who issued the flyer or bulletin possessed a reasonable suspicion justifying the stop, and (iii) the stop that in fact occurred was not significantly more intrusive than would have been permitted by the officer who issued the bulletin).

requested action.[25] This widely accepted principle of law is sometimes referred to as the "vertical" application of the collective knowledge doctrine,[26] to distinguish it from the much broader (and more controversial) "horizontal" collective knowledge doctrine alluded to in the State's brief.[27]

Under the horizontal application of the collective knowledge doctrine, some courts will automatically impute knowledge from one law enforcement officer to another, even in the absence of any direct communication or request for action.[28] Courts that have adopted this more expansive approach to the collective knowledge doctrine have generally done so under the theory that a "presumption of communication" among fellow officers working closely together "often will reflect what has actually taken place" and

---

[25] *Cf. Hensley*, 469 U.S. at 231 (describing this rule as based on common sense because it minimizes the volume of information that must be transmitted and facilitates prompt and efficient police action).

[26] In *Prater*, we referred to the collective knowledge doctrine as the "fellow officer" or "police team" rule. *See Prater*, 958 P.2d at 1111.

[27] For a comprehensive overview of the vertical and horizontal applications of the collective knowledge doctrine, see Derik T. Fettig, *Who Knew What When? A Critical Analysis of the Expanding Collective Knowledge Doctrine,* 82 UMKC L. Rev. 663, 672 (2014); *see also* Simon Stern, *Constructive Knowledge, Probable Cause, and Administrative Decisionmaking*, 82 Notre Dame L. Rev. 1085, 1110-11 (2007) (distinguishing between collective knowledge doctrines that rely on some type of direct communication between the officers and criticizing a "no communication" approach that views law enforcement officers working together as though they are acting as "a single organism" with a collective mind).

[28] 4 Wayne R. LaFave, *Search and Seizure* § 9.5(j), at 822-23 (5th ed. 2012) (The *Hensley* situation, where action was requested but the underlying factual basis was not communicated, must be distinguished from the situation in which neither the request nor the factual basis is communicated, but the officer making the *Terry* stop later relies upon the fact that a fellow officer possessed the requisite reasonable suspicion at the time the stop occurred.").

that "communication among officers during the exigencies of a stop … may often be subtle and nonverbal."[29]

This expansive approach to the collective knowledge doctrine has been criticized by other courts and commentators, particularly when it leads to a finding of reasonable suspicion or probable cause only by "aggregat[ing] bits and pieces of information from … myriad officers."[30] Neither this Court nor the Alaska Supreme Court has directly addressed to what extent Alaska law has adopted, or should adopt, this broader version of the collective knowledge doctrine.[31] Nor do we need to resolve that issue here because we conclude that reasonable suspicion to conduct the field sobriety tests existed, even without Trooper Fowler's observations of Hurlburt's impairment being imputed to Sergeant Escott.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[29] 4 Wayne R. LaFave, *Search and Seizure* § 9.5(j), at 823.

[30] 4 Wayne R. LaFave, *Search and Seizure* § 9.5(j), at 823, 823 n.571 & 572 (5th ed. 2012); *see also United States v. Massenburg*, 654 F.3d 480, 495 (4th Cir. 2011) (criticizing the horizontal expansion of the collective knowledge doctrine as undermining the purpose of the exclusionary rule); *State v. Rahier*, 849 N.W.2d 212, 217 (N.D. 2014) (noting the danger that unjustified police action will be taken "in the hopes it is later validated by tallying the knowledge of every officer and agency involved in the case").

[31] *See, e.g.*, *Newsom v. State*, 199 P.3d 1181, 1184-5 (Alaska App. 2009) (noting the narrowness of the *Prater* holding and declining to apply an expanded "community of knowledge" doctrine without better briefing on that issue).